SID LUCKMAN AND ESTELLE LUCKMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3959–65.    Filed July 24, 1968.

*George V. Delson* and *Arnold Broser*, for the petitioners.
*Lawrence Shongut* and *Stanley J. Goldberg*, for the respondent.

FORRESTER, *Judge:* Respondent determined a deficiency in peti-

---

tioners' income tax for the calendar year 1961 in the amount of $24,475.13.

The only issue is whether petitioners' receipt of $37,245.75 from Rapid American Corp. in 1961 was a taxable dividend or a return of capital. Respondent in his statutory notice of a deficiency determined the amount received to be $49,666 but has since stipulated that $37,245.75 is the correct figure.

The determination of this issue requires our resolution of the principal question:

Whether the exercise of restricted stock options (which had been granted by Rapid American Corp. to its employees) at a time when the option price was less than the market value of such stock reduced the corporation's earnings and profits, even though such options conformed to the provisions of section 421 of the Internal Revenue Code [1] and were therefore nondeductible as a business expense.

If such exercises did reduce earnings and profits then we must resolve the following questions (hereinafter called subsidiary questions for convenience of classification).

(1) Whether the corporation's deficit in earnings and profits offsets earnings and profits of corporations acquired under section 332 of the Internal Revenue Code, so that distributions to shareholders subsequent to the acquisitions are considered to be a return of capital rather than distribution of the acquired corporations' earnings and profits.

(2) Whether income recognized by the corporation from an installment sale in 1961 and 1962 should be disregarded in computing the corporation's earnings and profits for those years if the installment sale ultimately resulted in a net loss to the corporation.

(3) Whether respondent's determination (and the corporation's acquiescence after 1963) that the corporation's taxable income prior to 1961 was greater than that reported by the corporation, requires a retroactive adjustment in the corporation's earnings and profits at January 31, 1961, and thereafter.

### FINDINGS OF FACT

Some of the facts are stipulated and are so found.

The petitioners, Sid and Estelle Luckman, are husband and wife who at the time the petition herein was filed resided in Highland Park, Ill. Their joint income tax return for the calendar year 1961, on the cash receipts and disbursements method of accounting, was filed with the district director of internal revenue, Chicago, Ill.

Estelle Luckman is a party in this case solely because she filed a joint return with her husband. The issue in this case concerns amounts

---

[1] Unless otherwise noted, all references are to the Internal Revenue Code of 1954.

received by Sid Luckman and reference to the petitioner hereinafter refers only to him.

On April 6, 1961, and at all relevant times subsequently, the petitioner owned approximately 100,000 shares of the common stock of Rapid American Corp. (hereinafter sometimes referred to as Rapid or the corporation). His cost basis as to this stock was $1.56 per share.

Rapid is an Ohio corporation, incorporated under the laws of that State in 1902. Its common stock is widely held, there being in excess of 2,000 shareholders holding 2,053,107 shares at January 31, 1962. Its stock is listed on the American Stock Exchange.

Prior to 1960 Rapid kept its books of account and filed federal income tax returns on a calendar year basis. In 1960 with approval from the Internal Revenue Service, its annual accounting period was changed to a fiscal year ending January 31. The change became effective with the month ending January 31, 1960.

During the calendar year 1961 Rapid made cash distributions to its shareholders as follows:

| | |
|---|---|
| Mar. 30, 1961 | $175,324.70 |
| June 30, 1961 | 205,178.56 |
| Sept. 29, 1961 | 206,765.28 |
| Dec. 29, 1961 | 253,571.99 |
| Total | 840,840.53 |

Petitioner's share of these distributions totaled $37,245.75, and was received as follows:

| Date distributed | Date received | Amount |
|---|---|---|
| June 30, 1961 | July 1961 | $12,415.25 |
| Sept. 29, 1961 | October 1961 | 12,415.25 |
| Dec. 29, 1961 | December 1961 | 12,415.25 |
| Total | | 37,245.75 |

On or about February 8, 1962, Rapid mailed letters to all of its shareholders, including petitioner, advising them that all distributions paid by it on its common stock in 1961 constituted returns of capital and were consequently not taxable. It also filed U.S. Treasury Department Form 1096 indicating that it had determined its cash dividends to be nontaxable. Consequently, petitioner did not include any of the amounts received in his 1961 Federal income tax return as dividends.

In his statutory notice of deficiency dated April 15, 1965, respondent determined the amounts received from Rapid to be income under section 61 of the Internal Revenue Code.

Following are the facts concerning Rapid which give rise to the issue in the case.

FINDINGS OF FACT

## Principal Question

During an undisclosed period of time Rapid had issued restricted stock options, as defined by section 421 of the Internal Revenue Code, to certain officers and key employees. From January 1, 1957, through January 1962, Rapid's employees received 174,395 shares of the company stock by exercising such options, paying a total of $1,889,360 therefor. The total value of such stock, when issued, was $5,307,206. Shown below is a summary of the options exercised in each year:

| Year ended— | Number of shares issued | Amount received by Rapid | Market value at date of issuance | Difference |
|---|---|---|---|---|
| December 31, 1957 | 40,000 | $300,000 | $630,000 | $330,000 |
| December 31, 1958 | 214 | 2,358 | 4,753 | 2,395 |
| December 31, 1959 | 27,065 | 266,165 | 985,211 | 719,046 |
| January 31, 1960 | 1,122 | 10,332 | 45,770 | 35,438 |
| January 31, 1961 | 56,224 | 648,841 | 2,107,869 | 1,459,028 |
| Subtotals | 124,625 | 1,227,696 | 3,773,603 | 2,545,907 |
| January 31, 1962 | 49,770 | 661,664 | 1,533,603 | 871,939 |
| Totals | 174,395 | 1,889,360 | 5,307,206 | 3,417,846 |

When the options were exercised, Rapid recorded the receipt of cash and the issuance of the stock on its books of account, but made no other entries, nor any adjustments to its taxable income, earnings and profits, or accounting surplus.

Should the above facts warrant the reduction of the corporation's earnings and profits for purposes of the instant case, the parties agree and we find that the reduction should be $2,545,907 from the accumulated earnings and profits as of January 31, 1961, and $871,939 from current earnings and profits for the year ended January 31, 1962.

## Subsidiary Question No. 1

On or about April 1, 1961, Rapid acquired, in a stock-for-stock exchange, 100 percent of the stock of Cellu-Craft Products Corp. On or about July 31, 1961, Cellu-Craft Products Corp. and 10 other related Cellu-Craft companies were liquidated into Rapid in a nontaxable transaction under section 332 of the Internal Revenue Code. At that date the accumulated earnings and profits of all the liquidated companies totaled as follows:

Aggregate earnings and profits _____ $1,634,046.30
Aggregate deficits _____ (224,152.19)

## Subsidiary Question No. 2

On its income tax return for the year ended January 31, 1961, Rapid reported a sale of one of its operating divisions, American Paper Specialty, for $12,661,280.03, and elected to report a $3,567,228.15 long-term capital gain from the transaction on the installment basis. On Schedule D of its income tax return for the year ended January 31, 1961, it reported income of $563,400 from the transaction. The return was subsequently examined by a district director of internal revenue who required no changes made with respect to the reporting of the transaction.

On Schedule D of its income tax return for the year ended January 31, 1962, Rapid reported installment income of $1,101,807.58 from the transaction.

On its income tax returns for the year ended January 31, 1963, and January 31, 1964, Rapid did not report any gain from the installment sale. On its income tax return for the year ended January 31, 1965, Rapid reported an installment loss from the transaction of $3,917,979.43.

## Subsidiary Question No. 3

Sometime after 1963 the district director of internal revenue examined Rapid's income tax returns for the years 1955, 1956, 1957, 1958, 1959, the month ended January 31, 1960, and the year ended January 31, 1961. The examination resulted in respondent's disallowing certain deductions previously claimed by Rapid in the amount of $795,171.20, and asserting an income tax liability of $145,999.08. The parties agree, and we find, that if the above facts warrant an increase in Rapid's earnings and profits as of January 31, 1961, the increase should be in the net amount of $649,172.12.

Apart from the disputed items, earnings and profits of Rapid at January 31, 1961, were $404,477.80 and the current earnings and profits for the year ended January 31, 1962, were $68,081.72, however, as is discussed *infra*, petitioner has conceded (and we find) that if the principal issue (regarding the stock options) is decided against him, then Rapid had earnings and profits in excess of the amounts paid as dividends at all relevant dates in 1961.

### OPINION

## Principal Question

Rapid American Corp. had granted restricted stock options to its employees under section 421 [2] of the Internal Revenue Code, which

---

[2] SEC. 421. EMPLOYEE STOCK OPTIONS.

(a) TREATMENT OF RESTRICTED STOCK OPTION.—If a share of stock is transferred to

options were exercised for stock at less than its then fair market value between January 1, 1957, and February 1962. The narrow question for consideration is whether section 421, in addition to preventing Rapid from recognizing a business expense for income tax purposes under section 162, also prevented it from reducing its earnings and profits account.

Stock options granted at less than fair market value to employees are sometimes recognized by both the accounting profession and respondent's regulations as giving rise to "actual" business expenses of corporations, as opposed to artificial deductions, created solely for purposes of computing taxable income. Cf. Grady, "Inventory of Generally Accepted Accounting Principles for Business Enterprises," 7 Accounting Research Study 215; Finney & Miller, Principles of Accounting—Intermediate (6th ed. 1965) ; sec. 1.421–6(f), Income Tax Regs. Such actual expenses, when recognized for income tax purposes, are generally considered to reduce corporate earnings and profits available for dividends. Cf. Bittker, Federal Income Taxation of Corporations and Shareholders, sec. 5.04 (1965) ; sec. 1.312–6(a) and (b), Income Tax Regs.

Even where such actual expenses or losses of a corporation are not recognized for income tax purposes it is well settled that in the absence of statutory language to the contrary such items generally reduce earnings and profits. Cf. Bittker, *supra;* sec. 312(f), I.R.C. 1954; sec. 1.312–7(b) (1), Income Tax Regs.; I.T. 3764, 1945 C.B. 188; *Stern Brothers & Co.*, 16 T.C. 295 (1951) ; *Estate of Esther M. Stein*, 25 T.C. 940 (1956), affd. 250 F. 2d 798 (C.A. 2, 1957) ; *Jacob M. Kaplan*, 43 T.C. 580, 599 (1965) ; I.T. 3253, 1939–1 C.B. (Part 1) 178; *Sidney Stark*, 29 T.C. 122 (1957).

Respondent points out that one exception to this general rule is that income or expense items which are deferred for income tax purposes to later years do not reduce earnings and profits until the items are deducted from taxable income, citing sec. 1.312–6(a), Income Tax Regs.; *Benjamin Siegel*, 29 B.T.A. 1289 (1934) ; *Corinne S. Koshland*, 33 B.T.A. 634 (1935) ; *Bangor & Aroostook Railroad Co.*, 16 T.C. 578 (1951), affd. 193 F. 2d 827 (C.A. 1, 1951) ; *Commissioner v. South*

an individual pursuant to his exercise after 1949 of a restricted stock option, and no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 6 months after the transfer of such share to him—

(1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share ;

(2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which subsection (g) is applicable, with respect to the share so transferred ; and

(3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.

*Texas Lumber Co.*, 333 U.S. 496 (1948), and *May, Stern & Co.* v. *Commissioner*, 181 F. 2d 407 (C.A. 3, 1950), affirming a Memorandum Opinion of this Court.

Respondent attempts to apply the above regulations and decisions to the instant case. However, unlike the statutes in the above cases, the provisions of section 421 are not designed to merely defer the recognition of an expense. They expressly and permanently deny an employer a deduction. If it can be said that there is an otherwise deductible expense connected with a 421 option, then it is one which might be categorized as recognized but not allowed. Petitioner contends that it is recognizable in the instant case, and thus deductible from earnings and profits.

However, we find and hold that the statutory language and legislative history of 421 show that Congress did not intend for the exercise of restricted stock options to generate an expense, recognizable or otherwise. Thus, earnings and profits cannot be reduced.

The relevant provisions of section 421(a), relating to the tax treatment of restricted stock options, have previously been set forth in the margin.[3] Section 421(a)(1) and section 421(a)(2) clearly refer only to the tax treatment of the options for income tax computation purposes. The language of 421(a)(3) is not similarly restricted. That section reads as follows: "(3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred."

Petitioner's position is that this provision is designed only to limit the taxable gain which a corporation might otherwise have when treasury stock is issued pursuant to a restricted option. As an example, he points out that if a corporation had a basis in treasury stock of $50, granted an option to an employee at $100, and had the option exercised when the market value of a share of stock was $200, the corporation could be considered to have a taxable gain of $150, were it not for the provision.

We agree with petitioner that one purpose of the provision is to limit the amount of income to be recognized when treasury stock is issued pursuant to section 421. At the time the provision was passed in 1950 as section 130A of the 1939 Code, it was possible for a corporation to realize income when issuing treasury stock to employees, measured by the difference between the corporation's basis in the stock and its fair market value. Cf. *General Electric Co.* v. *United States*, 299 F. 2d 942 (Ct. Cl. 1962).

That one purpose of section 421(a)(3) was to prevent such taxation is clearly shown by the examples in the regulations promulgated under

---

[3] See fn. 2, *supra*.

130A in 1952. Section 29.130A–5(a)(4), ex. 1, Income Tax Regs., in discussing the treatment of an option from X corporation to E employee (at 95 percent of the fair market value of the stock), concludes:

X Corporation is not entitled to any deduction at any time with respect to its transfer to E of the stock. In computing its gain or loss, if any, upon such transfer, X Corporation is considered to have received no more than * * * [the option price] for the stock so transferred. * * *

Similarly in example 1 under section 29.130A–5(b)(3) discussing the tax treatment of an option for 85 to 95 percent of the market price, the example concludes:

For the purpose of computing gain or loss, if any, to the X Corporation on account of the transfer of the share to E, the X Corporation shall not be considered to have received any amount other than * * * [the option price] for the share.

The above examples remained a part of the regulations until section 421 of the 1954 Code was passed. When the regulations under section 421 of the 1954 Code were promulgated, language similar to that cited in the above regulations was omitted.

There is no difference in the wording between section 130A (a)(1), (a)(2), and (a)(3) of the 1939 Code and 421 (a)(1), (a)(2), and (a)(3) of the 1954 Code. However, it is clear that when section 1032 was enacted as part of the 1954 Code, such examples as to gain or loss on the issuance of the stock were no longer needed. This is so because section 1032 accomplishes the same result by providing that *no* gain or loss is to be recognized by a corporation upon the receipt of money or property for its stock regardless of the circumstances. That section reads as follows:

SEC. 1032. EXCHANGE OF STOCK FOR PROPERTY.—

  (a) NONRECOGNITION OF GAIN OR LOSS.—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.

Thus 1032 prevents recognition of gain (or loss) by a corporation upon the issuance of treasury stock to its employees under 421. If petitioner is correct in his assertion that 421(a)(3)'s only purpose is to restrict the amount of gain recognized on the issuance of treasury stock under a stock option plan, 421(a)(3) would be redundant in light of 1032.

We do not believe that 421(a)(3) has been relegated to the status of a useless appendage. The words "no amount other than the price paid under the option shall be considered as received * * * for the share" do not on their face limit themselves to computing recognized gain or loss. The language specifically denies recognition of the receipt of anything other than the cash paid in, when stock is transferred upon

the exercise of a restricted option. The question then is what is normally considered received, which is now excluded, when stock is issued pursuant to an option under 421?

The answer is found in S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 483, 526–527, issued prior to passage of section 130A (the predecessor to 421), which states:

> Your committee's bill (section 220) establishes a new set of rules for the tax treatment of certain employee stock options. Such options are frequently used as incentive devices by corporations who wish to attract new management, to convert their officers into "partners" by giving them a stake in the business, to retain the services of executives who might otherwise leave, or to give their employees generally a more direct interest in the success of the corporation.
>
> At the present time the taxation of these options is governed by regulations which impede the use of the employee stock option for incentive purposes. Moreover, your committee believes these regulations go beyond the decision of the Supreme Court in *Commissioner* v. *Smith*, 324 U.S. 177 (1945). The resulting uncertainty as to whether these regulations are in accordance with the law is an additional reason for legislative action at the present time.
>
> The rule applied under existing regulations is that an employee exercising an option to purchase stock from his employer corporation receives taxable income at the time the option is exercised to the extent of the difference between the market value of the stock at the time of exercise and the option (or purchase) price. The difference is taxed as ordinary income, * * * on the theory that it represents additional compensation to the employee. * * *
>
> Under your committee's bill no tax will be imposed at the time of exercise of a "restricted stock option" or at the time the option is granted and the gain realized by the sale of the stock acquired through exercise of the option will be taxed as long-term capital gain. Such treatment is limited to the "restricted stock option" for the purpose of excluding cases where the option is not a true incentive device. Options which do not qualify as "restricted stock options" will continue to be taxed under existing law.
>
> \*          \*          *          *          *          *          *
> *Since the options which qualify for special treatment are regarded as incentive devices rather than compensation, no deduction is allowed the corporation under section 23(a) [of the 1939 Code] with respect to a transfer of stock pursuant to a restricted stock option.* [Emphasis supplied.]

The above report makes it clear that any asset (other than "the price paid under the option") which a corporation receives from issuing options under section 421 is in the form of employee goodwill. Petitioner would have us value this item and allow it as a deductible expense from earnings and profits, measuring the deduction as the excess of the market value of the stock at the times of exercises over the option prices. This we cannot do.

Petitioner's contention necessarily assumes that there is value attaching to the goodwill received which may be recognized. But 421 (a) (3) explicitly limits recognition to only the price paid under the option. This necessarily excludes recognizing that any amount was

received pertaining to the goodwill. It follows that if no amount is considered received, there is no amount which can be considered as an item of expense to reduce earnings and profits.

We think it is clear within the context of section 421 itself and its legislative history, and we so hold, that the loss of a potential profit on the exercise of a restricted stock option does not reduce the issuing corporation's earnings and profits. Indeed, on the basis of the committee reports, it would be possible to argue that Congress equated the "incentive device" of the restricted stock option with the concept of future benefit to the corporation in the form of employee goodwill.[4] But on this basis, neither at the time the restricted stock options are granted, nor later when they are exercised, does the issuing corporation suffer any loss or expenditure which is not matched by the receipt of employee goodwill of equal value. In such a quid pro quo exchange, the corporation's earnings and profits account would remain unchanged. Moreover, even if we were to consider this goodwill concept controlling herein, petitioner would still be required to show that the goodwill thus acquired had a determinable useful life so as to have been amortizable, or that it had otherwise been entirely used up, in order to be in a position to attempt to justify a reduction of Rapid's earnings and profits. The record herein is utterly devoid of any evidence along these lines.

Petitioner cites *Commission* v. *LoBue*, 351 U.S. 243 (1956), for the proposition that stock options granted to employees are a form of compensation and as such (*inter alia*) reduce earnings and profits. But the Court in *LoBue* was considering options which were exercised in 1946 and 1947, years which were prior to the enactment of the pedecessor of section 421. In our view, Congress, in passing the 421 legislation, effectively provided that restricted stock options were not compensation, but were incentive devices. It follows that when the options in issue were exercised, section 421(a)(3) prevented Rapid from recognizing an expense which could reduce its earnings and profits.

Petitioner concedes that this holding makes it unnecessary for us to consider the questions raised by the subsidiary questions, for even if we decided those subsidiary questions in petitioner's favor, Rapid's earnings and profits at January 31, 1961, were at least $404,477.80, and on July 31, 1961, about one and one-half million dollars must be added to that amount because the Cellu-Craft Products Corps., having

---

[4] This view of restricted options as incentive devices is supported by the record in the instant case. Harry H. Wachtel, executive vice president of Rapid, testified, that a major purpose of Rapid's granting restricted options was to obtain and keep key officers of the corporation.

earnings and profits of that amount, were liquidated into Rapid under section 332 of the Internal Revenue Code.[5] Petitioner agrees that section 381 of the Code requires that a corporation acquiring the assets of another corporation under section 332 take into account the earnings and profits of the acquired corporation as of the close of the day of the distribution or transfer.[6] Cf. also Income Tax Regs., sec. 1.381(c)(2)–1.

Therefore at all relevant dividend dates, the earnings and profits of Rapid exceeded the amounts declared and paid. The receipt by the petitioner of the amounts paid were thus clearly dividend income as defined by sections 316 and 317 of the Code and includable in his gross income under section 301(c).

Despite its irrelevancy to this case, petitioner still urges us to determine the effect which the Cellu-Craft Products Corp. liquidation would have had on Rapid's earnings and profits if Rapid had had a deficiency in excess of the earnings and profits received. He asks us to

---

[5] For the facts concerning this liquidation, see subsidiary question No. 1 in the Findings of Fact.

[6] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is detemined under section 334(b)(2) ; * * *

\* \* \* \* \* \* \*

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

\* \* \* \* \* \* \*

(c) ITEMS OF THE DISTRIBUTOR OF TRANSFEROR CORPORATION.—The items referred to in subsection (a) are:

\* \* \* \* \* \* \*

(2) EARNINGS AND PROFITS.—In the case of a distribution or transfer described in subsection (a)—

(A) the earnings and profits or deficit in earnings and profits, as the case may be, of the distributor or transferor corporation shall, subject to subparagraph (B), be deemed to have been received or incurred by the acquiring corporation as of the close of the date of the distribution or transfer ; and

(B) a deficit in earnings and profits of the distributor, transferor, or acquiring corporation shall be used only to offset earnings and profits accumulated after the date of transfer. For this purpose, the earnings and profits for the taxable year of the acquiring corporation in which the distribution or transfer occurs shall be deemed to have been accumulated after such distribution or transfer in an amount which bears the same ratio to the undistributed earnings and profits of the acquiring corporation for such taxable year (computed without regard to any earnings and profits received from the distributor or transferor corporation, as described in subparagraph (A) of this paragraph) as the number of days in the taxable year after the date of distribution or transfer bears to the total number of days in the taxable year.

make this determination because he has a case pending before this Court for a year not now in issue. Should that case come before us, we will consider the question at that time. Anything further here would be mere dictum.

To give effect to respondent's concession,

*Decision will be entered under Rule 50.*