**Sid LUCKMAN and Estelle Luckman, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 17424.**

United States Court of Appeals Seventh Circuit.

Nov. 13, 1969.

Martin A. Coleman, Arnold Broser, New York City, for petitioners-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Tax Division, William L. Goldman, Lee A. Jackson, Lester B. Snyder, Attys., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and CAMPBELL,[1] District Judge.

CUMMINGS, Circuit Judge.

This is an appeal from a decision of the Tax Court upholding income tax deficiencies in the amount of $17,482.38 determined by the Commissioner of Internal Revenue for the calendar year 1961.[2] The decision below is reported in 50 T.C. 619 (1968).

The facts are undisputed. Taxpayers are husband and wife who file joint tax returns. During the taxable year he owned 100,000 shares of Rapid American Corporation ("Rapid") common stock. In 1961 he received $37,245.75 in corporate cash distributions. In February 1962, Rapid advised its stockholders that

---

1. Chief Judge Campbell of the United States District Court for the Northern District of Illinois is sitting by designation.

2. The original deficiency was determined to be in the amount of $24,475.13, based upon the taxpayers' alleged receipt of $49,666. Since that time, the Commissioner has stipulated that the income in question totaled $37,245.75.

such distributions constituted a return of capital and were therefore non-taxable. In reliance on this information, taxpayers failed to include these sums in their income tax return for 1961.

During the period from January 1, 1957, to January 31, 1962, pursuant to restricted stock options,[3] Rapid sold its employees 174,395 shares of its authorized but unissued common stock for $1,889,360. The fair market value of the stock at the time of issuance was $5,307,206. Taxpayers contend that the $3,417,846 difference between the fair market value and the price received represented compensation to the employees of Rapid and reduced the corporation's earnings and profits account. Such a reduction would create a deficit in earnings and profits, so that the 1961 distributions from Rapid to taxpayers would be a return of capital and not taxable as dividend income. However, the Tax Court held that

"* * * the statutory language and legislative history of [Section] 421 [of the Internal Revenue Code of 1954] show that Congress did not intend for the exercise of restricted stock options to generate an expense, recognizable or otherwise. Thus, earnings and profits cannot be reduced." 50 T.C. at p. 625.

The full Tax Court denied the taxpayers' motion for review. We reverse and remand.

The Internal Revenue Code nowhere defines "earnings and profits." With few exceptions, the Code contains no guide to the effect of specific transactions upon earnings and profits. A corporation's earnings and profits are neither equivalent to its surplus nor to its total taxable income. R. M. Weyerhaeuser, 33 B.T.A. 594 (1935). As used in federal taxation, this concept represents an attempt to separate those corporate distributions with respect to stock which represent returns of capital contributed by the stockholders from those distributions which represent gain derived from the initial investment by virtue of the conduct of business. The crucial issue is whether a given transaction has a real effect upon the portion of corporate net worth which is not representative of contributed capital and which results from its conduct of business. In order to make this determination it is necessary to scrutinize the economic effects of the particular transaction as well as its character and relation to the corporate business. Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, § 5.03 (2d ed. 1966).

The effect of a transaction upon earnings and profits is not necessarily dependent upon the tax treatment of the transaction in determining net taxable income for a given year. Thus certain items which are excluded from taxable income increase earnings and profits. Treas.Reg. § 1.312–6(b); R. M. Weyerhaeuser, 33 B.T.A. 594 (1935); Golden v. Commissioner of Internal Revenue, 113 F.2d 590 (3d Cir. 1940); United States Trust Co. of New York, 13 B.T.A. 1074 (1928); Liberty Mirror Works, 3 T.C. 1018 (1944); see generally, Bittker and Eustice, *supra*. Conversely, transactions have no effect upon earnings and profits where they represent "artificially created deductions or credits which are allowed for purposes of computing taxable net income, but which do not represent actual expenses or expenditures, *i. e.*, there is no outlay by the corporation for the deductions or credits represented by such items." Rudick, "Dividends" and "Earnings or Profits" Under the Income Tax Law: Corporate Non-Liquidating Distributions, 89 U.Pa.L.Rev. 865, 885 (1941); *R. M. Weyerhaeuser, supra;* Treas.Reg. 1.312–6(c); see Bittker and Eustice, *supra*. However, true expenses

---

3. As defined by Section 421(d) (1) of the Internal Revenue Code in effect during 1961, a "restricted stock option" refers to an employee stock option where the option price equals at least 85% of the then market value. The option is largely non-transferrable and must usually be exercised within ten years, normally by an employee owning less than 10% of the stock. The definition is now found in 26 U.S.C. § 424(b).

incurred by the corporation reduce earnings and profits despite their nondeductibility from current income for tax purposes. I.T. 3253, 1939 C.B. 178. Disallowed losses are generally taken into consideration in determining earnings and profits, as are nondeductible income and excess profits taxes. Jacob M. Kaplan, 43 T.C. 580, 599 (1965); I.T. 3764. This is even true of fraud penalties disallowed as deductions because of public policy. Estate of Esther M. Stein, 25 T.C. 940 (1956). These items reduce earnings and profits because they "clearly deplete the income available for distribution to the stockholders." Rudick, *supra,* at 887.

■ In the present case, the first question is whether below market value stock options generally represent economic expense to corporations, thereby reducing earnings and profits. As the Tax Court observed here,

"Stock options granted at less than fair market value to employees are sometimes recognized by both the accounting profession and [the Treasury's] regulations as giving rise to 'actual' business expenses of corporations, as opposed to artificial deductions, created solely for purposes of computing taxable income. Cf. Grady, 'Inventory of Generally Accepted Accounting Principles for Business Enterprises,' 7 Accounting Research Study 215; Finney and Miller, Principles of Accounting—Intermediate (6th ed. 1965); sec. 1.421–6(f), Income Tax Regs. Such actual expenses, when recognized for income tax purposes, are generally considered to reduce corporate earnings and profits available for dividends. Cf. Bittker, Federal Income Taxation of Corporations and Shareholders, sec. 5.-04 (1965); sec. 1:312–6(a) and (b), Income Tax Regs." 50 T.C. at p. 624.

Such options represent a clearly discernible and taxable economic gain to the employee to the extent the stock value exceeds the cost to him. Commissioner of Internal Revenue v. Lo Bue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142; Commis-

sioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830; Rank v. United States, 345 F.2d 337, 343 (5th Cir. 1965). By the same token, that same margin has been held to represent an economic outlay that is deductible for purposes of computing taxable income. Rev.Rul. 62–217, 1962–2 C.B. 59; Rev. Rul. 69–75, I.R.B. No. 1969–8, p. 9, February 24, 1969. In Hudson Motor Car Co. v. United States, 3 F.Supp. 834, 78 Ct.Cl. 117 (1933), the court held stock compensation to be deductible and noted that

" * * * if the additional compensation had been paid in cash and the cash had been used to acquire the stock, no question * * * could have been raised as to its deductibility." 3 F. Supp. at 846.

This point is equally applicable to compensation which is made through the bargain purchase of stock by the employee on the exercise of his option. Had the compensation been paid in cash and then used to purchase stock, there could be no question that the corporation had incurred a true economic expense which reduced earnings and profits. The amount of corporate assets available for distribution to those who owned stock at the time of the transaction is reduced to the same extent in either case. The economic effect of the two transactions is identical.

■ The Commissioner has also overlooked the business character and purpose of employee stock options. They represent a form of compensation paid to employees in connection with successful present and future business performance. They constitute a particularly rewarding form of bonus. They are not distributions with respect to stock and are not comparable to non-taxable pro rata stock dividends. Cf. United States v. Ogilvie Hardware Co., 330 U.S. 709, 67 S.Ct. 997, 91 L.Ed. 1192; Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611. The difference in the nature of the transaction, as well as its economic effect,

demonstrates the inapplicability of United National Corporation v. Commissioner of Internal Revenue, 143 F.2d 580 (9th Cir. 1944), and Grace H. Kelham, 13 T.C. 984 (1949), reversed on other grounds, 192 F.2d 785 (9th Cir. 1951), certiorari denied, 343 U.S. 927, 72 S.Ct. 760, 96 L.Ed. 1337. *United National* involved stock redemption as part of the reorganization of the corporation's capital structure. The transaction was strictly with respect to the company's stock and bore no relation to its business activities. The court properly viewed it as tantamount to a contribution to capital. Such transactions clearly do not affect either income or earnings and profits. Commissioner of Internal Revenue v. Inland Finance Co., 63 F.2d 886 (9th Cir. 1933); Rev. Rul. 66–353, 1966–2 C.B. 111; see also, Bittker and Eustice, *supra.* In *Grace H. Kelham* the notes payable represented long-term debt equity "invested" in the corporation. The loan did not affect income or earnings and profits at any time. The exchange of the notes for stock produced no gain to the corporation. Rather the transaction reorganized the company's capital. The result was the same as the satisfaction of the notes by cash followed by the investment of the cash in the corporation for stock.

The question remains whether Congress intended to prohibit expense treatment in the case of restricted stock options. There is no specific language either in Section 421 or elsewhere in the Code to that effect, in contrast to the treatment of wash sales. Cf. Section 312 (f) (1). The Tax Court felt, however, that Section 421(a) (3), limiting the amount received by the corporation to the option price paid for the stock, constituted an expression of Congressional intent that the exercise of restricted stock options results in a purely capital transaction, termed here as an expenditure matched by the receipt of employee good will (50 T.C. at p. 627). Under the statutory scheme governing restricted stock options, the employee need not report as income the difference between the market value of the stock and the price he paid. In turn, the employer is not permitted to deduct that difference in computing its taxable income.[4]

The original purpose of subparagraph (3) was to limit the taxable gain of the corporation to the option price where the stock's value exceeded that amount. Cf. General Electric Co. v. United States, 299 F.2d 942, 156 Ct.Cl. 617 (1962), Treas.Regs. §§ 29.130A–5(a) (4) and 29.130A–5(b) (3) (1939 Code). Nevertheless, the Tax Court felt that the enactment of Section 1032 of the 1954 Code (26 U.S.C. § 1032) made the specific provisions of Section 421(a) (3) redundant unless different intent could be inferred. As the Government concedes, this construction was not correct. The enactment of Section 1032 did not render Section 421(a) (3) a "useless appendage." The benefits extended to restricted stock options by Section 421 apply to options granted for the purchase of stock of a parent or subsidiary as well as for stock of the corporate employer. Under United States v. General Shoe

---

4. The key provisions are found in the following part of Section 421 of the Internal Revenue Code in effect in 1961:

"(a) Treatment of restricted stock options—If a share of stock is transferred to an individual pursuant to his exercise after 1949 of a restricted stock option, and no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 6 months after the transfer of such share to him—
"(1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;
"(2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which subsection (g) is applicable, with respect to the share so transferred; and
"(3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred."

Corporation, 282 F.2d 9 (6th Cir. 1960), certiorari denied, 365 U.S. 843, 81 S.Ct. 801, 5 L.Ed.2d 808, a corporation realizes income from property transferred to employees as compensation to the extent that the fair market value of that property exceeds its basis to the corporation. Thise would be equally true of the stock of a parent or subsidiary corporation. Consolidated Utilities Co. v. Commissioner of Internal Revenue, 84 F.2d 548 (5th Cir. 1936). Section 1032 does not provide for the non-recognition of gain from such transactions. Hence Section 421(a) (3) remains necessary in order to limit the taxable gain realized by a corporation which grants restricted options to employees in the stock of its parent or subsidiary.

The remainder of Section 421 leads us to conclude that this Section was intended to lay down rules relating to the specific income tax treatment of applicable transactions. As the Tax Court concluded, subparagraphs (1) and (2) of Section 421(a) "clearly refer only to the tax treatment of the options for income tax computation purposes." 50 T.C. at p. 625. It is fair to conclude that Congress was similarly disposed with respect to subparagraph (3). Other portions of Section 421 are directed with equal specificity to the other tax consequences of restricted stock options. E. g., Sections 421(f) (now substantially incorporated in Section 421(b), 26 U.S.C. § 421(b)) and 421(c).

The Commissioner contends, however, that the intent of Congress is manifest in the legislative history accompanying the bill as it was originally enacted. To this end he calls attention to the description of Section 130A of the 1939 Code, the precursor to Section 421, contained in Senate Report No. 2375, 81st Cong., 2d Sess. (August 22, 1950), 1950–2 C.B. 483, 526–527. The significant language from that report states:

" * * * [Special] treatment is limited to the 'restricted stock option' for the purpose of excluding cases where the option is not a true incentive device. Options which do not qualify as 'restricted stock options' will continue to be taxed under existing law.

\* \* \* \* \* \*

"Since the options which qualify for special treatment are regarded as incentive devices rather than compensation, no deduction * * * is allowed the corporation under section 23(a) [of the 1939 Code] with respect to a transfer of stock pursuant to a restricted stock option."

From this the Commissioner has inferred that Congress wished to alter the fundamental character of stock options so that restricted stock options would be treated entirely as capital transactions, with no effect upon earnings and profits.

This meager legislative history does not indicate an intent that restrictive stock options are to be deemed to have such a radically different character from other stock options. The Finance Committee's rationale for the symmetrical tax treatment of corporation and employee at the time of the option contains no indication of any intended effect on earnings and profits. Specific policies calling for nonrecognition of a transaction for income tax purposes do not carry over into the computation of earnings and profits unless the transaction also lacks any real economic significance. Such an extension of the policies of nonrecognition would be both unusual and unwarranted without an express statement on the part of the legislature. We feel that Congress would have made an express exception had it wished earnings and profits to remain unaffected by the exercise of restricted stock options under Section 421.

The remarks of the Senate Finance Committee clearly reveal that Section 421 was never intended to serve more than the narrow purpose of liberalizing the income tax treatment of stock options to employees. Prior to the passage of the 1950 Act, Treasury Regulations provided that gain realized by the employee on the exercise of his option was

taxed as ordinary income. The Finance Committee expressly stated:

> "Since the employee does not realize cash income at the time the option is exercised, the imposition of a tax at that time often works a real hardship. An immediate sale of a portion of the stock acquired under the option may be necessary in order to finance the payment of the tax. This, of course, reduces the effectiveness of the option as an incentive device." S.Rep.No. 2375, 81st Cong., 2d Sess., August 22, 1950.

Congress accomplished this narrow objective in Section 421(a) by simply providing for the nonrecognition of the transaction for current income tax purposes. At no time did the legislature express any misapprehension of the nature of the transaction or its economic effect. The treatment of disqualifying transactions prescribed by Section 421(f) (substantially incorporated in the present Section 421(b), 26 U.S.C. § 421(b)) clearly demonstrates this fact.

■■ A few lines of inconclusive legislative history and barely consistent statutory treatment are not sufficient to justify disregard of the plain language of the Section. Cf. American Community Builders, Inc. v. Commissioner of Internal Revenue, 301 F.2d 7 (7th Cir. 1962). We cannot ascribe such an intent to Congress upon such slight evidence as the Government has displayed. The Commissioner's suggested treatment of the effect of employee stock options upon earnings and profits conflicts with Congress' obvious purpose in prescribing favored treatment for these transactions. Congress enacted Section 421 for the purpose of encouraging the use of stock options. To do so, it eased the tax treatment to the recipient. A corresponding intent to impose greater burdens upon the corporation's shareholders may not be inferred. The Commissioner's contention disregards the separate corporate identity to a significant degree. The corporation, not the shareholders, util-

ized the stock option as a form of compensation.

On these facts, we agree with taxpayers that the consequences were these: stock having a fair market value of $5,307,206 was sold to employees for $1,889,360, resulting in an increase of cash of $1,889,360 and an increase in paid-in capital account of $5,307,206, and a decrease in the earnings and profits account of $3,417,846, which was the value received by the employees in excess of their payments. Looking at substance rather than form, Rapid is entitled to treat the $3,417,846 as an expense, just as if it had paid this amount in cash to its employees. Since Rapid was entitled to reduce its earnings and profits by the amount of this expense, the case must be remanded for consideration of the three subsidiary questions presented and not yet resolved by the Tax Court.[5]

Reversed and remanded.