SID LUCKMAN AND ESTELLE LUCKMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3959–65.   Filed August 31, 1971.

*George V. Delson* and *Arnold Broser*, for the petitioners.
*Lawrence Shongut* and *Stanley J. Goldberg*, for the respondent.

SUPPLEMENTAL OPINION

FORRESTER, *Judge*: The issue presented for our decision is to what extent petitioners' receipt in 1961 of $37,245.75 from Rapid American Corporation (hereinafter referred to as Rapid) was a taxable dividend.

Originally that issue turned upon the resolution of one principal question and three subsidiary questions. On November 12, 1968, in accordance with our opinion of July 24, 1968, reported at 50 T.C. 619, we entered our decision with respect to the principal question. Our resolution of the principal question made it unnecessary for us to reach any of the three subsidiary questions, consequently we did not decide them.

The Court of Appeals for the Seventh Circuit has now reversed our decision with respect to the principal question and remanded this case for our consideration of the three subsidiary questions. *Luckman* v. *Commissioner*, 418 F. 2d 381 (C.A. 7, 1969). In its opinion the Seventh Circuit decided that the exercise by Rapid's employees of certain restricted stock options effected a reduction in Rapid's earnings and profits.

The three subsidiary questions we must now consider are:

(1) Whether the deficit in Rapid's earnings and profits offsets earnings and profits of corporations acquired under section 332[1] so that distributions to shareholders subsequent to the acquisitions are consid-

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise specified.

ered to be a return of capital rather than a distribution of the acquired corporations' earnings and profits;

(2) Whether income recognized by the corporation in the fiscal years ending January 1961 and January 1962 from an installment sale consummated in fiscal 1961 should be disregarded in computing Rapid's earnings and profits for those years where the installment sale ultimately resulted in a net loss to Rapid;

(3) Whether respondent's determination (and Rapid's aquiescence after 1963) that Rapid's taxable income prior to 1961 was greater than that reported by Rapid, requires a retroactive adjustment in Rapid's earnings and profits at January 31, 1961, and thereafter.

On October 27, 1970, the parties filed with this Court a stipulation which they have represented as sufficient to place in the record all of the facts necessary for resolution of the three subsidiary questions. Both parties have also represented to this Court that they do not desire either further trial or the opportunity to file further briefs in respect of those questions.

Although largely duplicative of our Findings of Fact at 50 T.C. 619, all of the facts necessary for and relevant to the resolution of the three subsidiary questions are fully restated in the course of this opinion in order to provide an adequate background for our discussion. Reference to petitioner hereinafter refers only to Sid Luckman.

From and after April 6, 1961, petitioner was the owner of approximately 100,000 shares of Rapid's common stock. His cost basis with respect to this stock was $1.56 per share.

Prior to 1960 Rapid kept its books of account and filed Federal income tax returns on a calendar year basis. In 1960 with approval from the Internal Revenue Service, its annual accounting period was changed to the fiscal year ending January 31. The change became effective with the month ending January 31, 1960.

During the calendar year 1961 Rapid made cash distributions to its shareholders as follows:

| | |
|---|---|
| March 30, 1961 | $175, 324. 70 |
| June 30, 1961 | 205, 178. 56 |
| September 29, 1961 | 206, 765. 28 |
| December 29, 1961 | 253, 571. 99 |
| Total | 840, 840, 53 |

Petitioner's share of these distributions totaled $37,245.75 and was received as follows:

| Date distributed | Date received | Amount |
|---|---|---|
| June 30, 1961 | July 1961 | $12, 415. 25 |
| Sept. 29, 1961 | October 1961 | 12, 415. 25 |
| Dec. 29, 1961 | December 1961 | 12, 415. 25 |
| Total | | 37, 245. 75 |

Petitioner did not include any of these distributions as dividends in his 1961 Federal income tax return because he had been advised by Rapid that all distributions paid by Rapid on its common stock in 1961 constituted returns of capital and consequently were not taxable.

As of January 31, 1961, Rapid's accumulated earnings and profits (prior to any reduction for stock options exercised by its employees, including $563,400 reported as income from the disputed installment sale, and prior to any increase as a result of respondent's determination that Rapid's taxable income prior to 1961 was greater than Rapid had reported) amounted to $967,877.80. As a consequence of the Seventh Circuit's opinion at 418 F. 2d 381, the above figure is altered by the $2,545,907 reduction for stock options exercised by Rapid's employees, and becomes a net deficit of $1,578,029.20.

For the fiscal year ending January 1962, Rapid's current earnings and profits (prior to any reduction for stock options exercised by its employees, prior to any adjustments as a result of Rapid's acquisition of certain corporations under section 332, and including $1,101,807.58 reported as income from the disputed installment sale) amounted to $1,169,889.30. As a consequence of the Seventh Circuit's opinion at 418 F. 2d 381, the above figure is altered by the $871,939 reduction for stock options exercised by its employees during its fiscal year ending January 1962, and becomes $297,950.30.

### Subsidiary Question No. 1

On or about April 1, 1961, Rapid acquired in a stock-for-stock exchange 100 percent of the stock of Cellu-Craft Products Corp. On or about July 31, 1961, Cellu-Craft Products Corp. and 10 other companies related to Cellu-Craft Products Corp. (hereinafter collectively referred to as the Cellu-Craft companies) were liquidated into Rapid in a nontaxable transaction qualifying under section 332. At that date the accumulated earnings and profits of all of the liquidated Cellu-Craft companies totaled as follows: Aggregate earnings and profits, $1,634,046.30; aggregate deficits, $224,152.19.

Section 301(c)(1) provides that to the extent a distribution of property by a corporation to a shareholder is a dividend it shall be included in the shareholder's gross income. Section 316(a) defines the term "dividend" as any distribution of property made by a corporation to its shareholders as follows:

SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE. For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings

and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits.

In general, "the requirement that for income tax purposes every distribution is made out of such most recently accumulated earnings or profits is a conclusive statutory presumption." *J. Barstow Smull*, 17 T.C. 1393, 1398 (1952) ; and see, e.g., *Lawrence* v. *Commissioner*, 143 F. 2d 456, 459 (C.A. 9, 1944), affirming a Memorandum Opinion of this Court.

As pointed out in the appellate proceedings above, the Internal Revenue Code nowhere specifically defines "earnings and profits" and with certain exceptions provides no guide for determining the effect of particular transactions upon earnings and profits. 418 F. 2d at 383. One of these exceptions is section 381(c)(2) which is made operative by section 381(a).

Section 381(a)(1) provides that in the case of the acquisition of assets of a corporation by another corporation in a distribution to such other corporation to which section 332 applies (except in a case in which the basis of the assets distributed is determined under section 334(b)(2))²—

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or trasfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

In such case section 381(b) provides that, *inter alia*, the taxable year of the distributor corporation shall end on the date of distribution and the date of distribution shall be the day on which the distribution is completed. In conjunction with section 381(a) and (b), section 381(c)(2) provides as follows:

(2) EARNINGS AND PROFITS.—In the case of a distribution or transfer described in subsection (a)—

(A) the earnings and profits or deficit in earnings and profits, as the case may be, of the distributor or transferor corporation shall, subject to subparagraph (B), be deemed to have been received or incurred by the acquiring corporation as of the close of the date of the distribution or transfer; and

(B) a deficit in earnings and profits of the distributor, transferor, *or acquiring corporation* shall be used only to offset earnings and profits accumulated after the date of transfer. For this purpose, the earnings and profits for the taxable year of the acquiring corporation in which the distribution or transfer occurs shall be deemed to have been accumulated after such distribution or transfer in an amount which bears the same ratio to the undistributed earnings and profits of the acquiring corporation for such taxable year (computed without regard to any earnings and profits received from the distributor or transferor corporation, as described in subparagraph (A) of this para-

---

² There is no indication in the record that this is a case where the basis of the assets distributed was determined under sec. 334(b)(2).

graph) as the number of days in the taxable year after the date of distribution or transfer bears to the total number of days in the taxable year. [Emphasis supplied.]

Proper implementation of the statute would require that $1,634,046.30 of earnings and profits and a separate deficit of $224,152.19 in earnings and profits be considered to have been received by Rapid as of July 31, 1961, and, hence, within Rapid's fiscal year ending January 1962. See sec. 1.381 (c) (2)–1(a) (5) and (6), Income Tax Regs.[3] In particular, because of the proscription of section 381(c) (2) (B) no part of the $1,578,029.20 deficit in Rapid's accumulated earnings and profits as of January 31, 1961 (computed by taking into consideration the $2,545,907 reduction for stock options exercised by Rapid's employees and including $563,400 reported as income from the disputed installment sale, but prior to any increase as a result of respondent's determination that Rapid's taxable income prior to 1961 was greater than Rapid had reported), could be used to offset the $1,634,046.30 of earnings and profits accumulated by the Cellu-Craft companies through July 31, 1961. According to the statutory scheme, Rapid's own deficit as of July 31, 1961, could be used only to offset earnings and profits accumulated by Rapid after July 31, 1961. Sec. 381(c) (2) (B).

---

[3] (5) If (i) one or more corporations a party to a distribution or transfer has accumulated earnings and profits as of the close of the date of distribution or transfer, and (ii) one or more of such corporations has a deficit in accumulated earnings and profits as of such time, the total of any such deficits shall be used only to offset earnings and profits accumulated, or deemed to have been accumulated under subparagraph (6) of this paragraph by the acquiring corporation after the date of distribution or transfer. In such instance, the acquiring corporation will be considered as maintaining two separate earnings and profits accounts after the date of distribution or transfer. The first such account shall contain the total of the accumulated earnings and profits as of the close of the date of distribution or transfer of each corporation which has accumulated earnings and profits as of such time, and the second such account shall contain the total of the deficits in accumulated earnings and profits of each corporation which has a deficit as of such time. The total deficit in the second account may not be used to reduce the accumulated earnings and profits in the first account (although such earnings and profits may be offset by deficits incurred, or deemed to have been incurred, after the date of distribution or transfer) but shall be used only to offset earnings and profits accumulated, or deemed to have been accumulated under subparagraph (6) of this paragraph, by the acquiring corporation after the date of distribution or transfer.

(6) In any case in which it is necessary to compute the accumulated earnings and profits, or the deficit in accumulated earnings and profits, of the acquiring corporation as of the close of the date of distribution or transfer and such date is a day other than the last day of a taxable year of the acquiring corporation—

(i) If the acquiring corporation has earnings and profits for its taxable year during which occurs the date of distribution or transfer, such earnings and profits (a) shall be deemed to have accumulated as of the close of such date in an amount which bears the same ratio to the undistributed earnings and profits of such corporation for such year as the number of days in the taxable year preceding the date following the date of distribution or transfer bears to the total number of days in the taxable year, and (b) shall be deemed to have accumulated after the date of distribution or transfer in an amount which bears the same ratio to the undistributed earnings and profits of such corporation for such year as the number of days in the taxable year following such date bears to the total number of days in such taxable year. For purposes of the preceding sentence, the undistributed earnings and profits of the acquiring corporation for such taxable year shall be the earnings and profits for such taxable year reduced by any distributions made therefrom during such taxable year.

Post-July 31, 1961, events (such as an accumulation by Rapid of an operating deficit) might have resulted in a reduction of the above $1,634,046.30 accumulation of earnings and profits, but otherwise any distribution of property made by Rapid to its shareholders after July 31, 1961,[4] and during Rapid's fiscal year ending January 1962, must be presumed to have been a dividend at least to the extent of $1,634,046.30.

Petitioner admits that a literal reading of section 381(c)(2)(B) would seem to deny to Rapid the right to offset its own preacquisition deficit in earnings and profits against the surplus in earnings and profits of the Cellu-Craft companies acquired on July 31, 1961. However, he urges that Congress could not have intended a literal reading of section 381(c)(2)(B) and that the result in *Harter* v. *Helvering*, 79 F. 2d 12 (C.A. 2, 1935), reversing 30 B.T.A. 572 (1934), should be the result in this case. Although the precise point was not specifically discussed, the figures used in the *Harter* opinion indicate that the acquiring corporation's deficit in earnings and profits was canceled out by the distributor corporation's surplus in earnings and profits. In *Commissioner* v. *Phipps*, 336 U.S. 410 (1949), the Supreme Court distinguished *Harter* but apparently did not disapprove of the result therein.

The simple answer to petitioner's contention is that section 381(c)(2)(B) first became part of the Code some years after the decisions in *Harter* and *Phipps* and effectively precludes our reliance upon the earlier court-made rules in this area. Furthermore, as is revealed by the pertinent legislative history, Congress fully anticipated the result requested by respondent.[5]

Petitioner also argues that the literal application of section 381(c)(2)(B) would result in an unconstitutional taxation of capital. He contends that if the Cellu-Craft companies had not been liquidated, the continued payment of dividends by Rapid would have been a return of capital to Rapid stockholders. While this may be true, the liquidation of the Cellu-Craft companies into Rapid is the very event

---

[4] The March and June distributions are to be prorated in accordance with sec. 1.316–2(b) and (c), Income Tax Regs.

[5] S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 279 (1954), provides that:

"If the distributor or transferor corporation has a deficit in earnings and profits, section 381(c)(1)(B) [sic] is intended to provide that such deficit may only be included in the earnings and profits of the acquiring corporation accumulated after the date of acquisition. That is, such deficit cannot be used to reduce earnings and profits of the acquiring corporation accumulated before the date of acquisition. Likewise, a deficit of the *acquiring* corporation can only be used to reduce earnings and profits of the *acquiring* corporation accumulated after the date of acquisition and cannot be used to reduce earnings and profits acquired from the distributor or transferor corporation. [Emphasis supplied.]"

To the same effect is H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. A138 (1954).

which, by the operation of section 381(c)(2), provided an earnings and profits reserve from which the distributions by Rapid to petitioner were conclusively presumed to have been derived.

In this case the tax resulting from the successive application of sections 301(c), 316(a), and 381(c)(2) is attributable to petitioner's receipt of a portion of the aggregate accumulated earnings and profits from the Cellu-Craft companies. In that sense petitioner is being taxed upon a distribution which is a distribution of earnings and profits and not a return of capital.

Despite petitioner's contention to the contrary, Rapid's stockholders were not denied the right to consider and give effect to the deficits incurred by Rapid prior to fiscal 1961 and by the Cellu-Craft companies prior to July 31, 1961. The deficit account required to be established by section 1.381(c)(2)–1(a)(5) and (6), Income Tax Regs., would remain available to Rapid to offset earnings and profits accumulated after July 31, 1961. The stockholders' right to consider and give effect to this deficit was merely deferred. This deferral was no different than, for example, the deferral required to be made by a corporation having a huge accumulated deficit in earnings and profits as of January 31, 1961, but accruing during the fiscal year ending January 1962, current earnings and profits in excess of its distributions to its stockholders in that year. Such distributions would be deemed to be out of current earnings and profits and, hence, would in their entirety be taxable dividends. Sec. 316(a); sec. 1.316–2(a), Income Tax Regs.; e.g., *Waldheim* v. *Commissioner*, 244 F. 2d 1, 5 (C.A. 7, 1957), affirming 25 T.C. 839 (1956).

As a consequence of all of the foregoing, we resolve this subsidiary question No. 1 for the respondent.

*Subsidiary Question No. 2*

On its income tax return for the fiscal year ending January 1961, Rapid reported a sale of one of its operating divisions, American Paper Specialty (hereinafter referred to as Paper), for $12,661,280.03. Rapid elected to report a $3,567,228.15 long-term capital gain from that sale on the installment basis. See sec. 453. On its income tax returns for the fiscal years ending January 1961 and January 1962, respectively, Rapid reported income of $563,400 and $1,101,807.58 from the transaction. On its income tax returns for the fiscal years ending January 1963 and January 1964, Rapid did not report any gain from the installment sale. On its income tax return for the fiscal year ending January 1965, Rapid reported an installment loss of $3,917,979.43 from the transaction. It has now been stipulated that Rapid "did incur in its fiscal year ended January 31, 1965, a recognizable loss in the amount of, at least, $3,817,000 on the sale of installment notes receivable, which receivables were received in its fiscal

year ended January 31, 1961, in exchange for the sale of Rapid American Corporation's American Specialty Division."

By virtue of section 453(b), Rapid elected to return its income from the sale of Paper in the manner prescribed in section 453(a). Under section 453(a) Rapid was required to return as income from the installment sale that proportion of the actual payments it received in fiscal 1961 and 1962 which the gross profit (realized or to be realized when payment would have been complete) bore to the total contract price. Where an installment obligation is sold, section 453(d)(1) provides that:

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

Section 1.453-9(a), Income Tax Regs., provides that under the instant circumstances—

the entire amount of gain or loss resulting from any disposition or satisfaction of installment obligations, computed in accordance with section 453(d), is recognized in the taxable year of such disposition or satisfaction * * *

See *Joe D. Branham*, 51 T.C. 175 (1968).

Assuming that the amounts of income reported by Rapid in fiscal 1961 and 1962 were the proper amounts as computed under section 453, such section requires that in computing Rapid's *taxable income* with respect to its sale of Paper, $563,400 should have been returned as income in fiscal 1961, $1,101,807.58 should have been returned as income in fiscal 1962, and at least $3,817,000 should have been returned as a loss in fiscal 1965.

Turning now to section 312(f)(1) we find that gain or loss realized from a sale or disposition of property by a corporation—

shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing taxable income under the law applicable to the year in which such sale or disposition was made.

See *Ralph C. Wilson, Sr.*, 46 T.C. 334, 351, 352 (1966). The rule thus established by section 312(f)(1) is a corollary of the more general judicially established rule which provides that where an item is common to both taxable income and earnings and profits, consistency requires the use of the same accounting method in computing that item's effect upon both taxable income and earnings and profits. *Bangor and Aroostook Railroad Co.*, 16 T.C. 578, 584 (1951), affd. 193 F. 2d 827 (C.A. 1, 1951), certiorari denied 343 U.S. 934 (1952); *Corinne S. Koshland*, 33 B.T.A. 634, 641 (1935); *Benjamin Siegel*, 29 B.T.A. 1289, 1293 (1934).

In the instant case then, the amounts returned as income in fiscal 1961 and 1962 would tend to increase earnings and profits in those

years and the amount returned as a loss in fiscal 1965 would tend to decrease earnings and profits at, and not before, that time.

However, petitioner urges that as a consequence of the loss in fiscal 1965 the earlier reported gains of $563,400 and $1,101,807.58 should be disregarded in computing both Rapid's accumulated earnings and profits as of the close of fiscal 1961 and Rapid's current earnings and profits for fiscal 1962. Petitioner urges "that the gains included in taxable income were determined under a bookkeeping method and that E and P should not include 'bookkeeping' gains which were included in taxable income under an elective provision." Petitioner also urges that when "early subsequent events show that the income previously reported will not be realized, that E and P should be corrected."

Petitioner's use of the term "early subsequent events," is misleading. Here the "early subsequent events" leading to Rapid's recognizable loss of at least $3,817,000 did not occur until sometime during fiscal 1965 or approximately 4 years after the original sale of Paper. In any event his analysis does not coincide with the specific treatment required under sections 453 and 312. Having elected installment treatment, Rapid had to compute its taxable income in accordance with the rules set forth in section 453. And having computed taxable income with respect to the installment sale, Rapid had to compute its earnings and profits in accordance with section 312(f)(1).

Petitioner's reliance on such cases as *American Enka Corporation*, 30 T.C. 684 (1958); *Estate of Esther M. Stein*, 25 T.C. 940 (1956), affd. 250 F. 2d 798 (C.A. 2, 1958); *Geo. W. Ultch Lumber Co.*, 21 T.C. 382 (1953); *Pacific Affiliate, Inc.*, 19 T.C. 245 (1952), affd. 224 F. 2d 578 (C.A. 9, 1955), certiorari denied 350 U.S. 967 (1956); and *Stern Brothers & Co.*, 16 T.C. 295 (1951), is misplaced. Those cases dealt with the effect of various tax adjustments upon such quantities as accumulated earnings and profits, "invested capital," and "equity capital." In those cases we followed a judicially evolved rule which we believed would provide "an accurate and realistic picture of a taxpayer's *true financial status* at any particular moment." *American Enka Corporation, supra* at 693. For the instant situation, however, Congress has provided us with a detailed scheme for calculation of earnings and profits. Whether the rules of sections 453 and 312(f)(1) are called "bookkeeping methods" or "accounting methods," they are the rules Congress requires us to follow, and we do so.

### Subsidiary Question No. 3

Sometime after 1963 the district director of internal revenue examined Rapid's income tax returns for its calendar years 1955 through 1959, the month ending January 31, 1960, and the fiscal year ending

January 1961. This examination resulted in respondent's disallowing certain deductions previously claimed by Rapid in the amount of $795,171.20 and asserting an income tax liability of $145,999.08. Rapid has acquiesced in this result.

The parties now agree, and we find, that if the above facts warrant an increase in Rapid's earnings and profits as of January 31, 1961, the increase should be in the net amount of $649,172.12.

In the notice of deficiency herein respondent determined that the cash distributions petitioner received from Rapid in 1961 constituted dividend income includable in petitioner's income under section 61. In his petition, petitioner contended that the cash distributions he received in 1961 from Rapid "were not out of the accumulated earnings and profits or out of the earnings and profits of the taxable year for the corporation [Rapid]." The burden was on him to prove that contention. In effect this meant that he had to show what Rapid's earnings and profits were.

To show that the $795,171.20 of disallowed deductions would not tend to increase Rapid's earnings and profits balance, it was petitioner's burden to show that that the deductions were not properly disallowed, or, if properly disallowed, would not have affected Rapid's earnings and profits balance in a manner adverse to his position. He was not bound by any agreement between Rapid and the district director with respect to the disallowed deductions. Cf. *Phillips* v. *Commissioner*, 178 F. 2d 270 (C.A. 3, 1949), certiorari denied 339 U.S. 932 (1950), affirming 8 T.C. 1286 (1947) and 11 T.C. 653 (1948). As petitioner has failed to make any kind of a showing with respect to the $795,171.20 of disallowed deductions, we hold that Rapid's accumulated earnings and profits as of January 31, 1961, must reflect an increase of $649,172.12.

So that the parties may calculate Rapid's earnings and profits and petitioner's consequent tax liability,

*Decision will be entered under Rule 50.*