**Harold S. DIVINE and Rita K. Divine, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 130, Docket 73-1732.**

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1973.

Decided June 20, 1974.

Martin A. Coleman, Arnold Broser, Paul H. Asofsky, Allan M. Rosenbloom, Rubin, Wachtel, Baum & Levin, New York City, for petitioners-appellants.

Robert S. Watkins, Meyer Rothwacks, Paul M. Ginsburg, Attys., Tax Div., Dept. of Justice; Scott P. Crampton, Asst. Atty. Gen., for respondent-appellee.

Before WATERMAN, FRIENDLY and TIMBERS, Circuit Judges.

WATERMAN, Circuit Judge:

I

This appeal is taken from two decisions of the Tax Court, 59 T.C. 152 (1972), which held petitioners (appellants herein) liable for deficiencies in their personal income taxes of $9,416.35 and $20,944.40 for the calendar years 1961 and 1962, respectively. Inasmuch as appellants resided in the State of New York when they filed their petitions with the Tax Court seeking redetermination of tax liability, venue on this appeal is properly laid in this circuit, 26 U.S.C. § 7482(b)(1)(A); and we have jurisdiction under 26 U.S.C. § 7482(a).

The outcome of this case depends on our resolution of two legal issues. First, do the attendant circumstances permit or require application of the doctrine of collateral estoppel against the Commissioner of the Internal Revenue Service ("IRS")? Second, when, pursuant to the terms of statutory restricted stock options [1] granted by a corpora-

---

1. "Restricted stock option" is now defined in § 424 of the Internal Revenue Code. During the years pertinent to this case, however, that definition was contained in § 421(d)(1). All statutory references shall be to the Code sections as they were numbered in 1961 and 1962.

In 1961, § 421 read in pertinent part:
Section 421. *Employee stock options.*

(a) Treatment of restricted stock options. If a share of stock is transferred to an individual pursuant to his exercise after 1949 of a restricted stock option, and no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 6 months after the transfer of such share to him—

(1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

(2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which subsection (g) is applicable, with respect to the share so transferred; and

(3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.

This subsection and subsection (b) shall not apply unless (A) the individual, at the time he exercises the restricted stock option, is an employee of either the corporation granting such option, a parent or subsidiary corporation of such corporation, or a corpora-

tion or a parent or subsidiary of such corporation issuing or assuming a stock option in a transaction to which subsection (g) is applicable, or (B) the option is exercised by him within 3 months after the date he ceases to be an employee of such corporations. In applying paragraphs (2) and (3) of subsection (d) for purposes of the preceding sentence, there shall be substituted for the term "employer corporation" wherever it appears in such paragraphs the term "grantor corporation", or the term "corporation issuing or assuming a stock option in a transaction to which subsection (g) is applicable", as the case may be.

\* \* \* \* \*

(d) Definitions
For purposes of this section—
(1) Restricted stock option.
The term "restricted stock option" means an option granted after February 26, 1945, to an individual, for any reason connected with his employment by a corporation, if granted by the employer corporation or its parent or subsidiary corporation, to purchase stock of any of such corporations, but only if—

(A) at the time such option is granted—
(i) the option price is at least 85 percent of the fair market value at such time of the stock subject to the option, or
(ii) in the case of a variable price option, the option price (computed as if the option had been exercised when granted) is at least 85 percent of the fair market value of the stock at the time such option is granted; and
(B) such option by its terms is not transferable by such individual otherwise than by will or the laws of descent and

tion to its employees, those employees, in exercising the options, purchased the stock for less than the stock's fair market value, should the corporation's "earnings and profits" under § 316 of the Internal Revenue Code ("IRC" or "Code") be reduced by the difference between the fair market value of the stock so purchased and the prices paid by the employees? Appellants contend that either of these questions can be answered in the affirmative.

We do not agree that the Commissioner is collaterally estopped from relitigating the substantive tax question at issue here. On the substantive tax issue, an unusually complex issue, we are of the opinion, on balance, that the result for which the appellants contend is the correct one. Accordingly, we reverse the decision of the Tax Court and remand for redeterminations of appellants' tax liabilities for the tax year 1961.[2]

As Rita K. Divine is a party herein because she signed and filed joint tax returns with her husband, Harold S. Divine, the other appellant here, we shall refer to the taxpayers-petitioners-appel-

---

distribution, and is exercisable, during his lifetime, only by him; and

(C) such individual, at the time the option is granted, does not own stock possessing more than 10 percent of the total combined voting power of all classes of stock of the employer corporation or of its parent or subsidiary corporation. This subparagraph shall not apply if at the time such option is granted the option price is at least 110 percent of the fair market value of the stock subject to the option and such option either by its terms is not exercisable after the expiration of 5 years from the date such option is granted or is exercised within one year after the date of enactment of this title. For purposes of this subparagraph—

(i) such individual shall be considered as owning the stock owned, directly or indirectly, by or for his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendents; and

(ii) stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust, shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries; and

(D) such option by its terms is not exercisable after the expiration of 10 years from the date such option is granted, if such option has been granted on or after June 22, 1954.

(2) Parent corporation.

The term "parent corporation" means any corporation (other than the employer corporation) in an unbroken chain of corporations ending with the employer corporation if, at the time of the granting of the option, each of the corporations other than the employer corporation owns stock possessing 50 percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(3) Subsidiary corporation.

The term "subsidiary corporation" means any corporation (other than the employer corporation) in an unbroken chain of corporations beginning with the employer corporation if, at the time of the granting of the option, each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50 percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(4) Disposition.

(A) General rule.

Except as provided in subparagraph (B), the term "disposition" includes a sale, exchange, gift, or a transfer of legal title, but does not include—

(i) a transfer from a decedent to an estate or a transfer by bequest or inheritance;

(ii) an exchange to which section 354, 355, 356, or 1036 (or so much of section 1031 as relates to section 1036) applies; or

(iii) a mere pledge or hypothecation.

\* \* \* \* \*

(f) Effect of disqualifying disposition.

If a share of stock, acquired by an individual pursuant to his exercise of a restricted stock option, is disposed of by him within 2 years from the date of the granting of the option or within 6 months after the transfer of such share to him, then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred.

2. Both appellant and Commissioner, as well as the Tax Court, agree that reducing the

lants in the singular. The stipulated facts have been fully and accurately set forth in the opinion of the Tax Court below.[3] It is necessary, however, for us to summarize briefly those facts which are helpful to an understanding of the issues which we are required to resolve.

Rapid American Corporation (hereinafter "Rapid' or the "Corporation") is a publicly owned corporation. Its common stock during the years 1961 and 1962 was listed on the American Stock Exchange. As of January 31, 1963, Rapid had over 2,000 shareholders who held in the aggregate more than 2,000,000 shares of Rapid's common stock. Appellant Divine was one of those shareholders; his approximate holdings amounted to 37,000 shares in 1961 and rose to 40,000 in 1962.

During the years 1961 and 1962, Rapid made certain cash distributions, totaling some $840,840.53 in 1961, and $1,024,836.93 in 1962, to its shareholders. Appellant's portions of these disbursements were $18,501.40 in 1961 and $20,572.04 in 1962. Rapid advised the shareholders that the distributions did not have to be included by them in their individual personal income tax returns. This advice was predicated on the belief that Rapid's "earnings and profits" were insufficient to render these distributions dividends taxable as ordinary income to the recipients, but, rather, the recipients should consider the payments to be returns of capital and hence non-taxable.

At issue in this case is the manner in which Rapid's "current earnings and profits" and "accumulated earnings and profits" for its taxable years 1961 and 1962 should be computed. Specifically at issue is the correctness of a reduction

of earnings and profits to account for purported "compensation expenses" measured by the "loss" Rapid absorbed in making "bargain" sales of its common stock to certain of its employees who possessed restricted stock options to purchase the stock. Pursuant to the terms of these restricted stock options, during the period from January 1, 1957 to January 31, 1962, Rapid sold 174,395 shares of its common stock to some of its employees. Although these shares had a fair market value of $5,307,206, the corportion received only $1,889,360 from the employees who exercised their options. Rapid thus received $3,417,846 less for its stock than it could have received if the shares had been sold on the open market. In the period from February 1, 1962 to January 31, 1963 corporation employees purchased an additional 12,163 shares pursuant to the terms of options they held. Again, the prices paid by the employees, $155,388 in the aggregate, were substantially below the fair market value of the shares of stock, $363,914. It is argued that these differences of $3,417,846 and $208,526 represent compensation expense which should reduce corporate earnings and profits.

As already indicated, Rapid had advised its shareholders that these distributions for their tax years 1961 and 1962 did not constitute income taxable to the recipients. One of those receiving a portion of the 1961 distributions was a Mr. Sid Luckman. In reliance on the advice from Rapid, neither Divine nor Luckman considered these distributions as ordinary income. Later, the Commissioner mailed notices of deficiency to all Rapid shareholders, including Luckman and appellant Divine. These two shareholders challenged these alleged deficien-

earnings and profits by the difference between the fair market prices and the prices paid by employees will result in deficits in the Corporation's accumulated earnings and profits for the tax years ending January 31, 1962 and January 31, 1963 and in the current earnings and profits for the tax year ending January 31, 1963. However, inasmuch as there will be a surplus of $297,950.30 in the current earnings and profits for the tax

year ending January 31, 1962 it will be necessary in order to redetermine appellant's tax liabilities for his taxable year 1961 to compute the portions of the cash distributions received by appellant which are attributable to the current earnings and profits for the 1961 tax year.

3. See 59 T.C. 152 (1972).

cies by filing petitions in the Tax Court. In 1968, while Divine's petition for redetermination was still before the Tax Court, that court ruled against Luckman, see Sid Luckman, 50 T.C. 619 (1968), holding that a corporation's earnings and profits cannot be reduced by the spread between the fair market value of its stock and the prices paid for the stock by employees who purchased it by exercising restricted stock options the corporations had granted. Upon appeal the Seventh Circuit, reaching the opposite conclusion on the earnings and profits issue, reversed the decision of the Tax Court. See Luckman v. Commissioner of Internal Revenue, 418 F.2d 381 (7 Cir. 1969).

Undaunted by its defeat in the Seventh Circuit, the Internal Revenue Service adhered to its position on this issue, and in the Tax Court below the Commissioner contested Divine's petition seeking redetermination of his tax liability. Invoking the Seventh Circuit's decision in Luckman v. Commissioner, *supra,* which had expressly rejected the Commissioner's stance on the earnings and profits issue therein, appellant Divine argued to the Tax Court that the Commissioner was collaterally estopped from relitigating that precise issue against him. The Tax Court not only rejected this procedural argument but also refused in Divine's case to recognize *Luckman* as binding upon it, and refused to deviate from its own holding on the substantive issue in *Luckman* which the Seventh Circuit had nullified. The within appeal followed.

## II

As in the Tax Court below, Divine claims that the decision of the Seventh Circuit in Luckman v. Commissioner of Internal Revenue, *supra,* collaterally estops the Commissioner from litigating against appellant the same issue litigated in the Seventh Circuit; i. e., whether Rapid's earnings and profits should have been reduced to account for the "expense" allegedly incurred by the corporation in connection with its sale of its common stock to certain of its employees pursuant to the terms of restricted stock options held by those employees.

The American Law Institute's Restatement of Judgments provides a concise statement of one aspect of the classical view of "collateral estoppel" or "issue preclusion":

Where a question of law is actually litigated and determined in an action, the determination is ordinarily conclusive between the parties in a subsequent action involving the same subject matter or transaction, although based upon a different cause of action from that upon which the original action was based. Restatement of Judgments § 70, comment (b) (1942).

Refinement of the scope of "issue preclusion" requires reference to two additional sections of that Restatement. Section 83 expanded the category of those who might be precluded from bringing suit by explaining that "[a] person who is not a party but who is in privity with the parties in an action terminating in a valid judgment is . . . bound [under the rule of collateral estoppel]." Section 93, however, is more significant here: "[A] person who is not a party or privy to a party to an action in which a valid judgment . . . is rendered . . . (b) is not bound by . . . an adjudication upon any matter decided in the action." This rule, the "requirement of mutuality," prevented one from applying collateral estoppel against a party unless the one invoking the doctrine was himself bound by the former judgment. In the instant case, were the classical view of "collateral estoppel" still accepted by the courts and the academicians, Divine most certainly could not utilize the Seventh Circuit's holding against the Commissioner since Divine was neither a party to nor in privity to a party to that action.

Nevertheless, the issue is not so easily resolved, for even in the years prior to the Restatement's articulation of the principle of collateral estoppel the re-

quirement of mutuality of estoppel had come increasingly under attack from the courts and the intellectual community, and this assault has continued unabated. See, e. g., Bruszewski v. United States, 181 F.2d 419 (3 Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); Bernhard v. Bank of America National Trust & Savings Association, 19 Cal.2d 807, 122 P.2d 892 (1942); Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan. L.Rev. 281 (1957).

That the attack has been successful is evidenced by the number and source of the judicial decisions which have eroded the requirement of mutuality to the point where it might be supposed that it has been or should be finally interred. See, e. g., Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Zdanok v. Glidden Co., Durkee Famous Foods Division, 327 F.2d 944 (2 Cir. 1964); Bruszewski v. United States, supra.

It would be incorrect, however, to assume that the requirement has met its demise. For example, Zdanok, generally regarded as being one of the most important blows struck against the mutuality requirement, has been read restrictively in a number of subsequent cases. See Berner v. British Commonwealth Pacific Airlines, Ltd., 346 F.2d 532 (2 Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966); Fink v. Coates, 323 F.Supp. 988 (SDNY 1971); Agrashell, Inc. v. Bernard Sirotta Co., 281 F.Supp. 704, 708 (SDNY 1968) ("The rule of Zdanok is one of economy of administration and not one of abstractly perfect justice; indeed, even res judicata in its strictest aspect yields where an issue deeply invested with public concerns is involved.") In fact, the continuing life of the mutuality requirement in certain circumstances is suggested by the Supreme Court's careful and precise phrasing of the issue before it in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra:

"Obviously, these mutations in estoppel doctrine are not before us for wholesale approval or rejection. But at the very least they counsel us to re-examine whether mutuality of estoppel is a viable rule where a patentee seeks to relitigate the validity of a patent once a federal court has declared it to be invalid." 402 U.S. at 327, 91 S.Ct. 1442.

As there has been no "wholesale rejection" of the doctrine we must inquire whether it is appropriate for us to disapprove relitigation here by the Commissioner of the very issue decided against him by the Seventh Circuit.

To support his argument that the Commissioner should be precluded from relitigating that issue appellant relies principally on two cases, Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, supra, and Zdanok v. Glidden Co., Durkee Famous Foods Division, supra. In Blonder-Tongue, the narrow issue before the Court was whether a patentee whose patent has once been declared invalid by a federal court should be permitted to relitigate against another alleged infringer the validity of the patent. See 402 U.S. at 327, 91 S.Ct. 1434. Under the existing rule of Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), the patentee had this right. Blonder-Tongue "overruled [Triplett] to the extent it forecloses a plea of estoppel by one facing a charge of infringement of a patent that has once been declared invalid." 402 U.S. at 350, 91 S.Ct. at 1453 (emphasis supplied). Thus, the previously existing absolute right to relitigate was rescinded, and the right to relitigate (by recognizing in later actions estoppel defenses raised by non-parties to the first action) would be denied unless the patentee could "demonstrate, if he can, that he did not have 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time,'" id. at 333, 91 S.Ct. at 1445, quoting in part from Eisel v. Columbia Packing Co., 181 F.Supp. 298, 301 (D. Mass.1960). In reaching its decision

the Supreme Court engaged in an exhaustive analysis of a number of *policy* factors and found that allowing a patentee the general right to relitigate alleged infringements could cause an inordinate waste of judicial time and litigants' resources and could have unjustifiable anticompetitive effects in the market place. On the other hand, there was no substantial countervailing policy reason favoring a retention of the right to continue to relitigate against different alleged infringers the question of whether the patent was a valid one.

In *Zdanok* we also conditioned the right to relitigate an issue on whether there had been "a full and fair opportunity to litigate the issue effectively" the first time, 327 F.2d at 956, quoting *Currie, supra* at 308. The issue there, however, was a very narrow one—"the construction of a written contract" by a judge, 327 F.2d at 956; it involved an issue which could not be "subject to the varying appraisals of the facts by different juries." Id. The reasons for denying relitigation in *Blonder-Tongue* and the unexpressed reason for denying relitigation in *Zdanok,* see Agrashell, Inc. v. Bernard Sirotta Co., *supra,* 281 F.Supp. at 708 (The rule of *Zdanok* is one of economy of administration . . . .") built the rationale in each of these cases, the rationale that the litigant wishing to relitigate had already had a "full and fair opportunity" to substantiate his claim.

Appellant does not contend that *Blonder-Tongue* and *Zdanok* automatically foreclose the Commissioner's relitigation of *all* tax issues. What Divine does argue, however, is that under the circumstances here we should immediately proceed to apply the "full and fair opportunity" tests articulated by those decisions. This approach fails to comprehend that these tests appear to have been intended only to apply to certain classes of issues which for policy reasons it has been decided should generally be litigable only once. We do not reach application of these tests in this case, for we find that both *Blonder-Tongue*

and *Zdanok* are fairly distinguishable from the case at bar and thus neither controls our decision here. At first blush *Zdanok* might appear to be comprehensive enough to foreclose a litigant's right to relitigate most legal issues. Subsequent cases, however, have perceived the characterization of the issue in that case as being one not "subject to the varying appraisals of the facts by different juries," 327 F.2d at 956, a ground for finding that certain classes of issues are not within the Zdanok rule. For instance, in Berner v. British Commonwealth Pacific Airlines, Ltd., *supra* 346 F.2d at 541, we distinguished *Zdanok* on the ground that "the issues [in *Zdanok*]—interpretation of a collective bargaining agreement—were not likely to be decided on the basis of a jury's choice among different factual inferences, as was the case [in *Berner*]." In Fink v. Coates, *supra,* at that time the most recent case in the Texas Gulf Sulphur securities law litigation, shareholders were suing their corporation and some of its officers and directors under Section 10(b) of the Securities Exchange Act of 1934 for damages sustained by virtue of the issuance of a press release alleged to have been false and misleading. These shareholder-plaintiffs argued that the defendants were collaterally estopped from litigating the issues of the material falsity, and the defendants' knowledge thereof, because these same defendants had already lost a suit brought by other shareholders in the District of Utah in which this precise issue had been decided adversely to defendants. See Reynolds v. Texas Gulf Sulphur Co., 309 F.Supp. 548 (D.Utah 1970), aff'd in part and rev'd in part, 446 F.2d 90 (10 Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 943, 30 L. Ed.2d 788 (1972). In refusing to apply collateral estoppel, Judge Bonsal, 323 F. Supp. at 989–990, distinguished *Zdanok,* at least partially, on the ground that the issue in *Zdanok* was one the resolution of which would be the same in any forum. As evidence of the fact that the issue of the defendants' knowledge of

falsity was a difficult one and one subject to varying appraisals, the court adverted to the language of judges of the Second Circuit and the Southern District of New York rendered during the course of the principal Texas Gulf Sulphur litigation, which language fell short of stating that there was knowledge of falsity. See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 863 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969) (Waterman, J.) ("cannot . . . definitively conclude that [the press release] was deceptive or misleading"); id. at 866 (Friendly, J., concurring) ("No one has asserted, or reasonably could assert, that the purpose for issuing a release was anything but good."); SEC, v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 296 (SDNY 1966), aff'd in part and rev'd in part, 401 F.2d 833 (2 Cir. 1968) (Bonsal, J.) (those issuing release "exercised reasonable business judgment under the circumstances"). These judicial views were thus incompatible with the opinion of the district court for the District of Utah and clearly demonstrated that the resolution of the legal issue of knowledge of falsity might very well differ from forum to forum.

It goes without saying that the issue being here litigated is one which is "subject to varying appraisals." The Tax Court has twice expressed its opinion on the matter, and it has maintained its position despite an intervening reversal by the Seventh Circuit in Luckman v. Commissioner, *supra*. As we already stated, we are in accord with the result reached by the Seventh Circuit; the substantive issue here is undoubtedly a complex one however, subject to vastly disparate appraisals of different adjudicatory bodies. We thus think that the *Zdanok* holding is distinguishable from the case before us on the basis that the issue which confronts us is one which is "subject to varying appraisals."

*Blonder-Tongue* is more readily distinguishable. We could rely solely on the specificity with which the question before the Court was presented. The Court disclaimed any intention to decide more than "whether mutality of estoppel is a viable rule where a patentee seeks to relitigate the validity of a patent once a federal court has declared it to be invalid." 402 U.S. at 327, 91 S.Ct. at 1442. Beyond this, however, the policy reasons so carefully explicated by the Court to justify the general denial of the right to relitigate the validity of a patent do not preclude the Commissioner's relitigation of important tax issues here. In assessing the effects of allowing relitigation of patent validity, the Supreme Court found that patent litigation consumed a disproportionate amount of the federal courts' time, it had proven to be extraordinarily expensive to the litigants (particularly to the alleged infringer), that, for smaller companies who were allegedly infringing, this expense was prohibitive, and that allowing relitigation produced profound anticompetitive results in the market place. These phenomena are peculiar to patent validity relitigation, however, and have no bearing upon the consideration of the problem before us. Further, the Court was able to discover no legitimate countervailing reason for permitting this type of litigation.

Since neither *Blonder-Tongue* nor *Zdanok* is controlling in our determination of whether the tax issue here can be relitigated, our decision must ultimately rest on policy considerations. The absence of substantial justification for permitting relitigation of either patent validity or issues not "subject to varying appraisals" should be contrasted with the formidable policy justifications for sanctioning the Commissioner's relitigation in different circuits of legally identical tax issues, factually differentiable only in the identity of the taxpayer involved. The desirability of uniformity of administration of the tax laws certainly does not require extended discussion on our part. We would mention, however, certain features of tax issues which the federal courts are called upon to resolve. More so than most laws, the tax statutes are far reaching and affect

or might affect millions of citizens. The issues which arise in the course of administering these laws are thus of importance not only to the particular litigants but also to the general public. Moreover, because of the sheer extent of the subject matter of the revenue laws and their intricate language, the issues which confront the courts will often be pure issues of law concerning the interpretation of novel and cryptic sections of the Code. Thus, because of the unusual complexity of the tax laws, judicial conflicts over interpretations of law, as opposed to disagreement as to how the law should be applied to specific facts, are much more apt to occur than in other areas of federal concern. For example, judicial conflicts in the patent area typically concern the application of undisputed principles of law to a complicated array of facts and do not reflect differences over what the governing principles of law mean. See, e. g., Nyyssonen v. Bendix Corp., 342 F.2d 531 (1 Cir.), cert. denied, 382 U.S. 847, 86 S.Ct. 63, 15 L.Ed.2d 86 (1965). So, most unfortunately, in an area where the needs for uniformity and certainty are so great, small indeed are the prospects that they will be achieved fortuitously through courts of coordinate authority reaching compatible decisions.

In federal tax cases disputed questions of law are satisfactorily resolved only by U.S. Supreme Court decisions, for the Commissioner of the Internal Revenue Service has on many occasions taken the position, as he has in this litigation, that a Court of Appeals decision with which he disagrees has no binding effect on the Service's policies in other circuits. The uncertainty which may result is exacerbated by the fact that the decisions of a U.S. Court of Appeals are not habitually reviewed by the Supreme Court. There is no right of appeal from such a decision, see 28 U.S.C. § 1254, and under the guidelines of Supreme Court Rule 19 the granting of certiorari is often withheld until two or more circuits have adopted conflicting positions. See J. Mertens, Law of Federal Income Taxation, § 51.20, at 51–38 nn. 94, 95 (Supp.1974); United States v. O'Malley, 383 U.S. 627, 86 S.Ct. 1123, 16 L.Ed.2d 145 (1966). There may therefore be substantial periods of time during which a federal tax issue remains unresolved. We regard this as being a patently undesirable sitution. A fortiori, any action on our part which might further inhibit expeditious resolution by the Supreme Court would be imprudent, if not irresponsible. The appellant has requested us to hold that under the unique circumstances of this case, where the Commissioner is relitigating an issue which he has previously lost in a suit factually distinguishable only in the identity of the taxpayer-shareholder, the Commissioner should be held collaterally estopped. Although this contention is not an unappealing one, we feel constrained to reject it, for it contains two infirmities. First, as we have demonstrated, there can exist at times intolerable uncertainties in the interpretation of the tax laws which, as a practical matter, are eliminated only when the Supreme Court grants certiorari after the development of a conflict in the circuits. If we adopted the holding appellant seeks from us and our position were generally accepted, inquiry by other circuits might be foreclosed and thus chances for the early precipitation of a conflict on a disputed question be diminished. For example, although a majority of the panel agrees with the substantive result reached by the Seventh Circuit in *Luckman*, the earnings and profits issue we resolve is one on which there is very strong disagreement—compare the Seventh Circuit's reasoning in *Luckman* with that of the Tax Court in *Luckman* and here in *Divine* [4] and it would be disingenuous for us to deny that a conflict in the circuits might be achieved if the Commissioner should

---

4. See also an excellent student piece, Note, Employee Stock Options: The Effect Upon a Corporation's Earnings and Profits, 33 Maryland L.Rev. 190 (1973), which advocates a position contrary to the one we adopt.

choose to pursue the question further in another circuit in still another case. Acceptance of appellant's collateral estoppel argument, even as narrowly framed as it is, would decrease the probability that a conflict will be created as quickly as possible. On the other hand, of course, a conflict may not arise. Even so, having a number of circuits consider the substantive tax issue is desirable inasmuch as several consecutive adverse rulings may convince the Commissioner that the issue should no longer be contested. See, e. g., Stockstrom v. Commissioner of Internal Revenue, 88 U.S.App.D.C. 286, 190 F.2d 283, 284 n. 2 (D.C.Cir. 1951) which was subsequently overruled on other grounds in Automobile Club v. Commissioner, 353 U.S. 180, 183–184, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). We are also reluctant to accept appellant's argument because we discern no principled distinction between estopping the Commissioner here and estopping the Commissioner when the legal issue is the same but the attendant facts may be very much different. As there is no apparent rational distinction, our holding here could with little difficulty be extrapolated to estop the Commissioner from relitigating a tax issue when the facts are quite dissimilar.

■ In concluding our analysis, we think it important to mention that our decision is consonant with the often articulated grounds justifying the rule permitting collateral estoppel. The rule developed as a means of protecting a person from legal harassment and redundant legal fees. Divine will be subject to neither.

## III

■ Inasmuch as the Commissioner is not estopped from relitigating the earnings and profits issue previously decided in the Seventh Circuit in *Luckman* we must now decide whether we agree with the result reached by that court or whether we should adopt the position twice advocated by the Tax Court.

In this case the Commissioner claims that the cash distributions made to appellant by Rapid constitute "dividend" income which under § 61(a)(7) of the IRC is taxable to appellant as ordinary income. The word "dividend" is a term of art, the definition of which is found in § 316 IRC: A "dividend" is "any distribution of property made by a corporation to its shareholders—(1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the [current] taxable year." Much to our chagrin, and that of many of our judicial ancestors, however, the Internal Revenue Code does not define the operative phrase "earnings and profits" or describe the manner in which that elusive quantity should be calculated. Congress could, and certainly should, rectify this deficiency by promulgating guidelines to assist the courts which must control the evolution of the concept. Be that as it may, such legislative guidelines do not now exist, so we must treat the problem as adequately as we can with the resources at our disposal.

Most of the commentators have experienced no difficulty in explaining what "earnings and profits" *are not*. For example, the term is synonymous with neither "corporate surplus," see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 7.03, at 7–11 to 7–12 (Supp.1973); Luckman v. Commissioner of Internal Revenue, *supra* at 383; R. M. Weyerhaeuser, 33 B.T.A. 594 (1935), nor with "taxable income," see Bittker & Eustice, supra, ¶ 7.03, at 7–13; J. Mertens, Law of Federal Income Taxation, § 9.28, at 9–84 to 9–85 (Supp.1973); Luckman v. Commissioner of Internal Revenue, *supra*, 418 F.2d at 383, R. M. Weyerhaeuser, *supra*. Notably less successful have been the copious attempts to establish a coherent and workable scheme for determining when particular corporate transactions should reduce or increase a corporation's "earnings and profits." One

of the more traditional approaches explains:

"Earnings and profits, on the other hand, are not defined by act; but they have a settled and well defined meaning in accounting. Generally speaking, they are computed by deducting from gross receipts the expense of producing them. (Citations omitted). Thus, under the ordinary method of accounting, in computing earnings and profits there will be deducted, not only the items shown above, but others which are not, under the statute, deductible in computing taxable net income. In this classification may be listed such items as extraordinary expenses, charitable contributions, taxes paid the Federal Government, and taxes assessed against local benefits tending to increase the value of the property. (Citations omitted). Again, many items, such as interest upon the obligations of a state or political subdivision, tax-free Federal securities, and dividends from other corporations, must necessarily be considered in computing earnings and profits, though forming no part of taxable net income." R. M. Weyerhaeuser, 33 B.T.A. 594, 597 (1935).

The Seventh Circuit has expanded upon this exposition:

"As used in federal taxation, this concept represents an attempt to separate those corporate distributions with respect to stock which represent returns of capital contributed by the stockholders from those distributions which represent gain derived from the initial investment by virtue of the conduct of business. The crucial issue is whether a given transaction has a real effect upon the portion of corporate net worth which is not representative of contributed capital and which results from the conduct of business. In order to make this determination it is necessary to scrutinize the economic effects of the particular transaction as well as its character and relation to the corporate business." Luckman v.

Commissioner of Internal Revenue, *supra*, 418 F.2d at 383.

We propose first to determine whether in general the option spread "loss" suffered by a corporation upon an employee's exercise of a stock option is an "expense of producing gross receipts," resulting in a reduction of "earnings and profits." Should this be so, we must then determine whether the express terms or legislative history of § 421, the statute pertaining to the restricted stock options involved in this case, dictates a different result when dealing with this type of device.

Compensation paid to and received by the employees of a business are, of course, business "expenses of producing gross receipts" and therefore reduce earnings and profits. We must therefore ascertain whether the "bargain spread" existing when an employee exercises a stock option is a "compensation expense." Compensation of employees for past, present and future services represents one of the most fundamental and necessary expenses of operating a business. Payment may be made in myriad modes; it need not always be by way of cash disbursement. For instance, an employee may be paid in stock. In lieu of such an immediate transfer of stock to an employee the employee may instead be granted an option to purchase the employer corporation's stock at a fixed price per share from the company at some future date. Employees find the stock option to be a particularly attractive compensation device; in a rising market it gives the employee the opportunity to make a "bargain purchase." The question of whether the "bargain or option spread" (i. e., the difference between the option price and the fair market value of the stock at the time of the exercise of the option) existing at the time the option is exercised is compensatory in nature has been well settled for nearly twenty years. In Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956), the Supreme Court, noting that "it seems impossible to say that [the bar-

gain transfer] was not compensation," id. at 247, 76 S.Ct. at 803, commented upon this point:

"They were made by a company engaged in operating a business for profit, and the Tax Court found that the stock option plan was designed to achieve more profitable operations by providing the employees 'with an incentive to promote the growth of the company by permitting them to participate in its success.'

\* \* \* \* \* \*

"When assets are transferred by an employer to an employee to secure better services they are plainly compensation. It makes no difference that the compensation is paid in stock rather than in money." Id. at 246–247, 76 S.Ct. at 803.

When compensation is paid in its conventional form, cash, the magnitude of the expense (and, consequently, the reduction in earnings and profits) is easily visualized because there is an actual outflow of liquid corporate assets. When a bargain sale of stock to employees is made, however, both the existence and the extent of the corporate efflux are not as readily discernible. The same conceptual problems are presented when a corporation incurs an economic detriment when compensating employees by making awards of bonus stock to employees for the receipt of which the employees pay nothing into the corporate treasury. Yet the Service has twice ruled[5] that the transfer of an employer's corporate stock to an employee as compensation produces for the transferor corporation a business expense deduction measured by the *fair market value* of the transferred stock, irrespective of whether that value exceeds the corporation's cost basis, if any, in the stock. Inasmuch as this deduction is allowed under § 162, which permits deduction only for those "expenses *paid* or *incurred* . . . in carrying on any . . . business," 26 U.S.C. § 162(a) (emphasis added), these rulings appear to recognize that grants of bonus stock are expenses and have caused or should be considered as causing actual depletion of the corporate assets. Furthermore, these rulings demonstrate that the Service itself chooses to regard the fair market value, and not the cost basis, as one of the indices to be used in gauging the extent of the corporate expense incurred in compensating an employee by means of a direct award of stock. But the economic impact upon the corporation of the transfer of stock to employees pursuant to the exercise of employee stock options is in all important respects indistinguishable from the transfer of bonus corporation stock to employees. The only distinguishing feature of the option arrangement is that the employee pays something rather than nothing, but, it remains that in both instances, "at the end of these transactions, [the corporate] employer [is] worth . . . less to its stockholders." Commissioner of Internal Revenue v. LoBue, *supra* at 245, 76 S.Ct. at 802. Accordingly, we would expect that the "bargain spread" would be considered to constitute a cognizable expense which would necessarily reduce earnings and profits. The Tax Court in *Sid Luckman, supra,* acknowledged that this *is* precisely the approach that is normally taken:

"Stock options granted at less than fair market value to employees are sometimes recognized by both the accounting profession and respondent's regulations as giving rise to 'actual' business expenses of corporations, as opposed to artificial deductions, created solely for purposes of computing taxable income. Cf. Grady, "Inventory of Generally Accepted Accounting Principles for Business Enterprises," 7 Accounting Research Study 215; Finney & Miller, Principles of Accounting—Intermediate (6th ed. 1965); sec. 1.421–6(f), Income Tax Regs. Such actual expenses, when recognized for income tax purposes, are generally considered to reduce cor-

---

5. See Rev.Ruling 62–217 and Rev.Ruling 69–75.

porate earnings and profits available for dividends. Cf. Bittker, Federal Income Taxation of Corporations and Shareholders, sec. 5.04 (1965); sec. 1.312–6(a) and (b), Income Tax Regs.

"Even where such actual expenses or losses of a corporation are not recognized for income tax purposes it is well settled that in the absence of statutory language to the contrary such items generally reduce earnings and profits. Cf. Bittker, *supra*; sec. 312(f), I.R.C.1954; sec. 1.312–7(b)(1), Income Tax Regs.; I.T. 3764, 1945 C.B. 188; Stern Brothers & Co., 16 T.C. 295 (1951); Estate of Esther M. Stein, 25 T.C. 940 (1956), affd. 250 F.2d 798 (C.A.2, 1957); Jacob M. Kaplan, 43 T.C. 580, 599 (1965); I.T. 3253, 1939–1 C.B. (Part 1) 178; Sidney Stark, 29 T.C. 122 (1957)." 50 T.C. at 624.

As this excerpt discloses, "such actual expenses" reduce earnings and profits unless there is a clear congressional intention in the Internal Revenue Code to deny the use of the reduction by taxpayers.

The treatment accorded § 421 stock options should not differ, then, from that accorded nonstatutory stock options, which *do* reduce earnings and profits, unless § 421 expressly proscribes the reduction of earnings and profits by the amount of the bargain spread or, in the event the section does not expressly proscribe the reduction, unless the legislative history of the section discloses that § 421 options have a fundamentally different economic effect, see Luckman v. Commissioner of Internal Revenue, *supra* at 383, (or, whether in fact they do or don't, Congress believed they do on that portion of the corporate net worth not representative of contributed capital.

From our examination of § 421, we conclude that the express language of the section does not prohibit the reduction of earnings and profits by the amount of the bargain spread. Subsection (a) is the only segment of Section 421 which conceivably could have any bearing on the effect on the corporation's earnings and profits of the grant of the options, or by their exercise. Provided compliance is had with the qualification requirements of the section, each part of subsection (a), the operative nucleus of § 421, performs a very specific and clear function. Paragraph (1) provides that the employee shall not be considered to have realized any income at the time he exercises the option. In return for relieving the employee from immediate taxation, paragraph (2) exacts a *quid pro quo* from the corporation by denying to it the right to take a business deduction as if for the business expense incurred in the nature of compensation to the employee while the employee continues to satisfy the qualification requirements of § 421. This paragraph only involves the corporation's taxable income, however, and, as noted above, the authorities have stated categorically that a corporation's earnings and profits do not represent a carbon copy of such corporation's taxable income. Paragraph (3) declares that "no amount other than the price paid under the option shall be considered as received by any . . . such [corporation] for the share so transferred." The original purpose of this paragraph was to limit the amount of gain which would have to be recognized for income taxation when the corporation sold either its own treasury stock or stock of an affiliated corporation[6] pursuant to the terms of restricted stock options. Without paragraph (3) the corporation would have had to declare the Fair Market Value of the stock as the amount it received for the stock it was selling to employees under the options.[7] Since the

---

6. Section 421(d) permitted both treasury stock and the stock of an "affiliated" corporation to be used in restricted stock options. See footnote 1 supra.

7. It has been recognized that when an employer transfers property to an employee as compensation for services, for purposes of computing the gain which the employer

employee presumably would delay exercising the option until the Fair Market Value of the stock had risen substantially above the option price, the corporation, upon the sale of the stock to the employee would have to recognize income in the amount by which the Fair Market Value (and not the price paid by the employee, the option price) exceeded the corporation's cost basis, if any, in the stock. Paragraph (3) restricts the taxable gain on these transactions to the excess of the option price (i. e., the price actually paid by the employee) over the corporation's cost basis. However, after the enactment of Section 421, Section 1032 was promulgated. Section 1032 provides, inter alia, that a corporation shall *not* recognize *any* gain on the sale of its own stock, *including* treasury stock. The Tax Court, in *Luckman* and here also,[8] believed that § 1032 must have rendered § 421(a)(3) a "useless appendage," inasmuch as § 1032 terminated all taxation of the gain from sale of treasury stock pursuant to the exercise of statutory stock options. But, as Paragraph (3) was retained, the Tax Court reasoned that it must have been retained to prohibit the reduction of earnings and profits by the amount of the bargain spread. The Tax Court's conclusion was incorrect. Section 1032 did not obviate the need for paragraph (3). A corporation may also use stock of an *affiliated* corporation in a § 421 employee stock option plan, see § 421(d), and inasmuch as § 1032 does not prevent recognition of gain from the sale of this sort of stock, § 421(a)(3) did not become vestigial.

In any event, it appears that the meaning which the Tax Court attributes to § 421(a)(3) causes the two paragraphs preceding it to become "useless appendages." This is an ironic result.

The Tax Court extracted from the limitation on the amount to be considered as received by the corporation a corresponding limitation on the amount to be considered expended by the corporation as compensation:

"It follows that if no amount is considered received, there is no amount which can be considered as an item of expense to reduce earnings and profits." 50 T.C. at 628.

If there is no expense, then there manifestly can be no deduction for an expense, and § 421(a)(2), which expressly proscribes such deduction, would be unnecessary. Moreover, if the Tax Court's holding be correct that no amount be considered expended by the corporation (i. e., given to the employee as compensation) beyond that actually received (by the corporation from the employee in the form of the option price for the stock) then no express statutory prohibition against recognition of income by the employee would be necessary. Yet there *is* such a statutory restriction, § 421(a)(1). In assigning to § 421(a)(3) an untenable interpretation, the Tax Court unwittingly would render paragraphs (1) and (2) superfluous.

In view of the fact that the express terms of § 421 are of no assistance in deciding whether earnings and profits are properly reduced by the amount of the option spread, we must next peruse the legislative history to ascertain whether the real economic effect of the grant and exercise of statutory restricted stock options is at variance with the real economic effect of the grant and exercise of nonstatutory options. As the Seventh Circuit in Luckman v. Commissioner of Internal Revenue, *supra* 418 F.2d at 386, stated, the position of the Commissioner is that the legislative history discloses "that Congress

realizes upon distribution of the property the employer is considered to have received an amount equal to the fair market value of the property. See United States v. General Shoe Corp., 282 F.2d 9 (6 Cir. 1960), cert. denied, 365 U.S. 843, 81 S.Ct. 801, 5 L.Ed.2d 808 (1961).

8. The Tax Court predicated its decision below on the grounds articulated therein and also on the rationale developed by it in Sid Luckman, 50 T.C. 619 (1968), rev'd 418 F.2d 381 (7 Cir. 1969).

wished to alter the fundamental character of stock options so that restricted stock options would be treated entirely as capital transactions, with no effect upon earnings and profits." We do not regard this as the purpose of the legislation. Senate Report No. 2375, 81st Cong., 2d Sess. (1950), printed in 1950 U.S.Code Cong.Service, pp. 3053, 3114, in describing § 421's predecessor legislation in the Internal Revenue Code of 1939, states:

> "At the present time the taxation of these options is governed by regulations which impede the use of the employee stock option for incentive purposes. Moreover, your committee believes these regulations go beyond the decision of the Supreme Court in Commissioner v. Smith, 324 U.S. 177 [65 S.Ct. 591, 89 L.Ed. 830] (1945). The resulting uncertainty as to whether these regulations are in accordance with the law is an additional reason for legislative action at the present time."

The language manifests an intention only to remove significant tax obstacles impeding the use of employee stock options, devices thought to possess social utility because they created greater employee participation in the American free enterprise system. This goal of employee involvement had been frustrated by existing tax policies which mandated that the bargain spread be recognized as income to the employee immediately upon his exercise of the option. To pay the tax then due the employee taxpayer would often have to sell some of this stock, so acquired through the exercise of the option, which thereby retarded employee entrance into the corporate structure. The purpose of the new legislation was to postpone taxation of the employee and thus permit a more likely retention by him of the stock interest he acquired through exercise of the option.

Searching further, we discover nothing else in the legislative history that persuades that earnings and profits should not be reduced by the amount of the option spread. Both the Tax Court and the Service substantially rely on one phrase in the above cited Senate Report No. 2375 to sustain their contrary position:

> "Since the options which qualify for special treatment *are regarded as incentive devices rather than compensation,* no deduction is allowed the corporation under section 23(a) with respect to a transfer of stock pursuant to a restricted stock option." 1950 U.S.Code Cong.Service at p. 3115. (Emphasis added).

For several reasons, we attach little significance to this language. As the Supreme Court subsequently stated in *LoBue,* it is indisputable that, at least in a theoretical sense, incentive devices *are* compensation. The language of the Senate Report thus could not reasonably be read to mean that the incentive devices at issue here are *not* compensation. This language in the Senate Report is but the statement of a conclusion the legislators had reached,—namely, that a taxwise *quid pro quo* was being exacted from corporations in return for temporarily immunizing their employees from taxation. That exaction is accomplished by disallowing to a corporation an expense deduction by "regarding" the benefit granted the employee as being something other than compensation.

Inasmuch as it is only when Section 421 options are exercised that the option spread is "regarded as" being something other than compensation to an employee, and is so regarded only for the limited purpose of removing former unfavorable tax consequences to the employee receiving and exercising the option, there is no economic justification for finding that Congress believed that the use of these incentive devices have (or that Congress intended that they should have) a different economic effect on the corporation from the economic effect of the grant and exercise of options other than Section 421 options. We perceive no congressional intention to effect any change in the actual earnings and profits of a corporation, but only an in-

tention to affect the computation of the corporation's taxable income. The disallowance of the expense deduction is predicated on reasons extraneous to the real economic effect of a grant of restricted stock options and their exercise by holders.

Furthermore, where Congress has elsewhere desired to prohibit a reduction of earnings and profits, it has done so explicitly. For example, see Section 312(f) which prohibits a reduction of earnings and profits for "wash sales" disallowed as deductions under Section 1091. It would have been a simple matter to have inserted such an explicit provision here. Indeed, in view of the fundamental changes which the Service contends Congress sought to institute, discussed above, we would *expect* to find such a proscription. Yet there is none, and there is no indication that anything other than the corporation's computation of taxable income was being considered and intended.

As the Senate Report demonstrates, Congress sought to encourage employee participation in American free enterprise by encouraging the utilization of employee stock options. This goal can only be achieved, however, if corporate employers are favorably disposed toward granting this type of benefit. Nevertheless, Section 421(a)(2) denies an expense deduction to the corporation. Many employers may feel, however, that this tax disadvantage is counterbalanced by the attractiveness of the restricted stock option device as a lure for acquiring superior personnel. But a further disincentive to the use of the restricted stock option device lies in the fact that the corporation's pre-option shareholders are already injured through the dilution caused by the exercise of the options. To hold that there is further disadvantage, again to the shareholders, by virtue of a prohibition against the ordinary reduction of earnings and profits, and the consequent conversion of some corporate distributions into dividends, would discourage use of statutory stock options altogether and would thus appear to contravene clearly the congressional purpose to promote the utilization of this device.

Although, as we have indicated, there is no reason to believe that Congress intended to deny the right to reduce earnings and profits here, we should further emphasize the inherent untrustworthiness of the Senate Report upon which the Service and the Tax Court so strongly rely. We would be most reluctant to predicate a decision, as the Commissioner would have us do, solely on the basis of that document. The Report is in several places grossly inconsistent with the legislation which it purports to explain. For example, the Report states in part:

"The stock acquired under a "restricted stock option" must not be sold less than 2 years subsequent to the date on which the option is granted, and the stock purchased under the option must be held for a period of not less than 6 months. Thus, under the bill the employee will receive special treatment only if he remains in the employment of the company for a substantial period after the time when he acquires the option and actually invests in the stock of the company for a considerable period." 1950 U.S.Code Cong.Service at p. 3115.

This description of how the section functions is incorrect. Section 421 does' not require that the employee remain in the employ of the employer for even one day after acquisition of the option. In fact, such an employee could commence working for a competitor of his present employer one day after acquiring the option and nevertheless still satisfy the requirements of § 421 and thereby gain the tax advantages of capital gains rates and deferred taxation.

As a concluding comment, we reiterate our belief that the holding which we reach today is one which comports with economic reality and with the mechanics of operating a business. As the Seventh Circuit noted in Luckman v. Commissioner, *supra*, if, instead of stock options, the corporation's employees had received cash there obviously would have

been a cognizable corporate "expense." These stock options so granted were presumably the product of careful and deliberate negotiations between the corporation and the employees involved, and were apparently considered by the employees to be an acceptable, indeed, probably a superior, alternative to cash. In turn, the corporation undoubtedly expected to profit, and probably did profit, in precisely the same way it would have profited if it had awarded cash to those key employees, for, of course, this supplemental compensation to employees would normally cause the recipients to produce increased earnings and profits for the corporation.

In approaching a proper resolution of the tax issue here it is inequitable and unreasonable not to weigh the tangible corporate detriment resulting from the corporation's lost opportunity to sell the optioned stock to the public at its Fair Market Value, a detriment incurred in the hope that the grant of the options would result in producing added revenues. Moreover, in measuring the extent of the compensation, and the corresponding expense, by the amount of the excess of the Fair Market Value over the option price, realistic account is taken of the relationship between the employer and the employee. A company's revenues and profitability have a strong influence on the value of its stock and thus on the potential compensation accruing to the employee by virtue of the spread existing when the option he holds is exercised. Yet, typically, the employees who hold options are capable of increasing corporate revenues through their intensified labor and, insofar as such employees can affect corporate profitability, these same employees can indirectly influence the magnitude of their own compensation. Thus, the "bargain spread" does, in the form of increased employee compensation to the employees holding options, accurately reflect the economic detriment which the corporation has incurred in order, hopefully, to produce more revenue just like any other "development expense."

Reversed and remanded to the Tax Court for determination of the extent to which the 1961 distributions to appellant constitute dividends taxable to him as ordinary income.[9]

FRIENDLY, Circuit Judge (concurring and dissenting):

I agree with so much of Part II of the majority opinion as holds that one taxpayer should not be allowed to use a previous determination of an issue of federal tax law adverse to the Commissioner in a proceeding involving another so as to preclude the Commissioner from pressing the point again, even when, as here, the facts are identical. I base this on special factors relating to federal tax litigation, well described in my brother Waterman's opinion, which make the application of Zdanok v. Glidden Co., 327 F.2d 944 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), inappropriate in this context. I would leave open the possibility of issue preclusion in a tax case where the earlier decision turned on the resolution of a complex common issue of fact.[1] And I see no occasion for extended dicta on the limits of *Zdanok* outside the federal tax field.

I agree also with the majority's rejection of many of the Commissioner's arguments on the merits. Nevertheless, I think that the Tax Court was right in Sid Luckman, 50 T.C. 619 (1968), and in its unanimous decision here, 59 T.C. 152 (1972), and that the Seventh Circuit erred in reversing in Luckman v. C.I.R., 418 F.2d 381 (7 Cir. 1969).

The question in this case reduces to whether the "opportunity cost" incurred by Rapid in issuing the stock to the employees at less than its current market value rather than selling it to others is cognizable for purposes of reducing

9. See footnote 2 supra.

1. For example, if in a case like this, the previous taxpayer had asserted a higher and the Commissioner a lower fair market value of the stock and another court had decided against the Commissioner.

earnings and profits. There can be no claim that Rapid incurred out-of-pocket costs such as to reduce the earnings and profits available for distribution, to shareholders. Indeed, as an accounting matter, far from *reducing* proprietorship on Rapid's balance sheet, issuance of the shares here in question *added* $2,044,748 to capital and paid-in surplus.[2]

With all deference, I think the question can only be answered in the negative. *See* Note, Employee Stock Options: The Effect Upon a Corporation's Earnings and Profits, 33 Md.L.Rev. 190, 207–08 (1973). Apart from the absence of evidence that Rapid could have sold the optioned stock at the market prices on the respective days of issuance, or would have done so, precisely the same sort of "cost" is incurred on the exercise of a warrant at a price below current market value, where no one suggests that this spread can be deducted from earnings and profits. The fact that here the options were issued to provide "incentive" to employees is not sufficient to support a different result. Selling stock at less than current market value does not impair the corporation's ability to make distributions without invading capital or paid-in surplus, which is what "earnings and profits" are mainly about. The effect of the exercise of an option, whether issued to an employee or to an outsider, at a "bargain spread" is to decrease the market price [3] and, in some but not all instances, the book value of the shares of other stockholders. It has no adverse effect on the corporate accounts.

The petitioner's principal reliance is on two revenue rulings that, despite the

general provision of § 1032(a) prohibiting recognition of gain or loss on a corporation's receipt of money or property in exchange for stock (including treasury stock), a corporation may deduct as a business expense under § 162 the fair market value of stock issued as compensation, whether the stock be treasury or theretofore unissued stock, Rev.Rul. 62–217, 1962–2 Cum.Bull. 59; Rev.Rul. 69–75, 1969–1 Cum.Bull. 52, with the presumable consequence that the same amount may be deducted from earnings and profits. Not only were these payments clearly compensation and nothing more, but the rulings can be rationalized on the basis that since the employee was subject to tax on the fair market value of the stock issued, allowing the deduction to the corporation was necessary to avoid unfairness. The latter is also the explanation given by the Tax Court in its opinion here, rather persuasively in my view, for the Regulation 1.421–6(f), allowing a deduction for the excess of fair market value over option price of stock issued pursuant to *unrestricted* stock options. Compare Union Chemical & Materials Corp. v. United States, 296 F.2d 221, 224–225, 155 Ct.Cl. 540 (1961), reasoning from C.I.R. v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956). By contrast, in the case of *restricted* stock options such as that before us, the employee escapes regular income taxation both when the option is issued and when it is exercised. There is therefore no reason to disregard the general principle of allowing no deduction, either from income or from earnings and profits, for mere loss of "opportunity costs."

In substance § 421 represented a trade-off. In return for the eagerly

2. In contrast, a cash payment to the employees of the "bargain spread" would have *reduced* surplus and, to the extent that this was insufficient, capital by $3,626,372. This alone is enough to place in question the Seventh Circuit's reliance on the analogy to compensation "paid in cash and then used to purchase the stock." 418 F.2d at 384. Moreover, unless the employees were required to invest the payments in corporate stock, a requirement which would call into question the reality of the whole arrangement, compare Turner v. C.I.R., 303 F.2d 94, 97–98 (4 Cir.), cert. denied, 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962), the attempted analogy does not pay adequate deference to the stated purpose of § 421 to promote stock ownership by employees. *See*, e.g., S.Rep.No. 2375, 81st Cong. 2d Sess. 59–60 (1950).

3. In fact this will already have been affected by the known possibility of exercise of the options.

sought privilege of tax-free receipt and exercise of stock options by executives, the corporation would forego any deduction under § 162 for the excess of the market value of the stock, when issued, over the option price. In light of the enthusiasm of corporations, perhaps more accurately of corporate managements, for the tax-free stock option, I find the majority's discovery of a Congressional fear that imposing the "further disadvantage" of not allowing the bargain spread as a reduction in earnings and profits—an issue which apparently has arisen only in this one reported case in 24 years [4]—would "discourage use of statutory stock options altogether" a bit risible. Although I agree with the majority that Congress was not so naive as to ignore that restricted stock options had features of compensation,[5] see, e. g., S.Rep.No.2375, supra, at 59–60, the essence of the § 421 trade-off was that they were to be treated as if they did not. There can be no fair doubt that the Congress that expressly ruled out use of the "bargain spread" to employees as a deduction would also have forbidden its use to reduce earnings and profits if it had ever considered the problem whether the "bargain spread" should enable the corporation to make a later distribution to stockholders as out of capital rather than from earnings and profits in the unusual case where this possibility might exist. Since general principles of accounting and tax law combine in leading to a negative answer, the courts ought not to strain to provide a bonanza in this unusual but nevertheless important case but should carry out the evident purpose of Congress. "Its laws are not to be read as though every *i* has to be dotted and every *t* crossed," United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 548–549, 70 S.Ct. 309, 315, 94 L.Ed. 317 (1950) (dissenting opinion of Mr. Justice Frankfurter). The much quoted remark of Mr. Justice Holmes in Johnson v. United States, 163 Fed. 30, 32 (1 Cir. 1908), is also applicable here.

I would affirm the judgment of the Tax Court.

---

4. As a practical matter, the problem will only arise with the somewhat unusual combination of a rather low amount of earnings and profits and a large rise in market price after issuance and before exercise of the options.

5. Despite language in C.I.R. v. LoBue, *supra*, at 247, 76 S.Ct. 800; *see also* Union Chemical & Materials Corp. v. United States, *supra*, 296 F.2d 221 at 224–225, it would not have been difficult for Congress to have considered that bargain spread in particular —as distinguished from the institution of the stock option in general—is not *in fact* predominantly compensatory in nature. The compensation aspect of a restricted stock option is most prominent at the time of issu-

ance of the option. By the time of exercise, on the other hand, which the *LoBue* Court assigned for evaluation of the amount of compensation simply because it is not practical to make the evaluation earlier, the investment aspect of the option has become dominant. Indeed, the very unpredictability of what the bargain spread will be when the option is awarded makes it difficult to look on that sum as having been assigned as compensation; and this difficulty is accentuated by the fact that, as Judge Waterman accurately observes, the predecessor of § 421, as enacted in 1950, did not require that the employee "remain in the employ of the employer for even one day after acquisition of the option."